

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CR–15–259

| | |
|---|---|
| MICHAEL BOYD | **Opinion Delivered** September 14, 2016 |
| APPELLANT | |
| | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, FOURTH DIVISION |
| V. | [NO. CR13–3549] |
| STATE OF ARKANSAS | |
| APPELLEE | HONORABLE HERBERT WRIGHT, JUDGE |
| | AFFIRMED |

## CLIFF HOOFMAN, Judge

Appellant Michael Boyd was convicted by a Pulaski County Circuit Court jury of aggravated robbery and theft of property and was sentenced to thirty and ten years of imprisonment, respectively, to be served consecutively.[1] On appeal, he contends that the trial court committed reversible error by denying (1) his motion for a directed verdict, (2) his motion to suppress statements made by him in a police interview, and (3) his motion to suppress a photo identification of him made by a bank teller. We affirm.[2]

---

[1]Although appellant was also charged with possession of firearms by certain persons, that charge was nolle prossed by the State.

[2]Our court previously ordered rebriefing. *Boyd v. State*, 2015 Ark. App. 596. Appellant's attorney filed a substituted abstract, brief, and addendum, but we determined that it was again deficient. We then issued an opinion stating that complete rebriefing was not required but that counsel was required to prepare a supplemental abstract and addendum. *Boyd v. State*, 2016 Ark. App. 74. Appellant's attorney prepared and filed a supplemental abstract and addendum as ordered. The appeal is now sufficiently briefed such that we can reach the merits of the appeal.

The crimes were alleged to have occurred at approximately 4:15 p.m. on September 13, 2013. A man had entered a Bank of the Ozarks branch in North Little Rock with what appeared to be a handgun in his waistband, demanded money, took $4,000 of the bank's money, and left in a car that had been described by bank tellers. Appellant was stopped in his car about an hour after the armed robbery. Appellant had a similar appearance to the man described by bank tellers and seen in bank surveillance video. Appellant submitted to an interview at the police station and waived his Miranda rights. In the interview, appellant made incriminating statements, admitting to having visited three banks that day, to having been at the bank that was robbed, to having what he described as a fake gun, and to taking money from a bank teller. Appellant's attorney filed a pretrial motion to suppress asserting in part that his statement should be suppressed because the officer illegally used promises of leniency to acquire his custodial statements, rendering them involuntary.

At the hearing on this motion to suppress, Detective Michael Gibbons testified that he interviewed appellant. He explained that he read appellant his Miranda rights, that appellant told him that he understood his rights, and that he wished to waive his rights in order to give a statement. The interview lasted more than one hour. Although appellant repeatedly asked whether he could receive a bond on these charges, Detective Gibbons testified that he never promised appellant a bond, noting that appellant was not yet charged with anything.[3] The

_____

[3]The detective said at different points in the recorded interview that, "I'm not going to lie to you and tell you you're goin' home....I have no control of a bond....I don't set the bond....It's gonna be charged as [a] real [gun]....based on video and their identification it doesn't matter what you say. ...I'm not gonna lie and tell you you can go home...from the video I can prove it looks like a real gun...I don't set the bond....I don't set the rules....if

2



detective said that he told appellant that if a gun was not used or if it was not real, then a crime was considered robbery, where a bond was possible, but that a bond was not possible for aggravated robbery. The detective made clear that appellant was "all about getting a bond, no matter what the charge was," but that he told appellant that he would not lie and tell him he could go home. He admitted that he falsely told appellant that seven people had identified him as the robber and that traffic cameras had showed his vehicle at the scene. Detective Gibbons explained that he did not threaten appellant in order to obtain his confession. Furthermore, he testified that appellant had numerous prior offenses and that appellant had extensive experience with the criminal justice system, including having his Miranda rights read to him and having been to prison numerous times for felonies. Appellant confessed during the interview that he went into the three banks that day (two Metropolitan Banks and the Bank of the Ozarks), that he had a mask on, that he had a fake gun with him although he denied pulling it out, and that a teller gave him the money.

Defense counsel argued that this confession was involuntary because it was the product of the detective's false promise of leniency. The State argued that there was no promise, much less a clear promise, of acquiring appellant a bond and that the detective repeated that he could not make such a promise. The State asserted that under the totality of circumstances with this criminally experienced defendant, suppression was not warranted. At the conclusion

---

you're charged with aggravated robbery, the standing rule now is no bond…I can't promise you anything." Toward the end of the interview, appellant repeatedly asked "do I get a bond," and the detective twice said "no." Thereafter, appellant eventually admitted to incriminating facts.

of the hearing, the trial court denied the motion to suppress, and a written order was subsequently filed.

Appellant also filed a pretrial motion to suppress the evidence of a photo identification made by witness Kathryn Pannell, alleging that the lineup was unduly suggestive. There were two written orders filed prior to trial denying this motion, but the trial court agreed to consider the motion again during the course of the trial.

At trial, the State put on proof that a man matching appellant's description had shown up at two Metropolitan Bank locations that day before entering a nearby Bank of the Ozarks location, where the robbery took place. North Little Rock police officer Kasey Knight was involved in responding to the report from a Metropolitan Bank of a "suspicious male" who came in wearing a dust mask, sunglasses, a hat, and who was acting "kind of odd." Knight viewed bank surveillance video, which led him to broadcast to other officers to be on the lookout for this approximately thirty-year-old black male.

A bank manager at that Metropolitan Bank branch, Sholanda Jenkins, testified to her description of the man and that she asked him to take off the dust mask, but he refused, saying that he had the flu. She verified a still photo of the man in the bank that day as shown on bank surveillance.

A teller from that Metropolitan Bank branch, Kathryn Pannell, testified that, while she was on a break, she observed appellant without his mask on immediately before he entered the bank. She also observed his vehicle and license plate that she was able to report to police—a black Toyota with license plate 198 SRG. She confirmed that appellant was

becoming agitated when he could not get the tellers to provide him a cash advance on a card that did not have his name on it. They locked the bank door after he left; appellant tried again to enter the bank but left instead. Pannell called the police. Pannell identified appellant in court stating that she was "100% sure" that appellant was the man in the still photos that showed a full-length color picture of appellant in her bank lobby. She said he had the mask in his hand before he put it on, and he told her that he had the flu as he walked into the bank. She said that when he was inside the bank, the mask kept coming down and he would have to put it back up.

Pannell had also identified appellant out of a six-person photo spread when presented with it about four months after the robbery. Pannell said that the detective never suggested who to pick out, and she did not have any doubts about her recognizing appellant in the photos. She testified that her job was in customer service, and she remembered people. Appellant renewed his motion to suppress the photo-spread identification made by Pannell. Defense counsel complained that Pannell did not identify appellant until months after the robbery; it was based on her brief observation of appellant; and the lineup was unconstitutionally suggestive. The State responded that this was a very good lineup with similar looking men with nothing suggestive about it. The trial court rejected the motion by sustaining its earlier ruling.

The State called employees of the robbed Bank of the Ozarks, located on Camp Robinson Road, to testify about what they saw and heard that day. Sharon Erwin, one of the tellers at Bank of the Ozarks, testified that the assailant had entered the bank wearing a black

SLIP OPINION

shirt, black hat, dark sunglasses, and a white surgical mask. She said she knew something was not right. She overheard him demand $10,000 from another teller, Pam Buzbee, who was in the window next to her. After Buzbee refused and told the man to take off his mask, the man told Buzbee that he had the flu, called Buzbee "a bitch," lifted up his shirt, showed the gun, and finally pulled the gun out and waved it around. Erwin testified that Buzbee was hesitant to give him the money, so she pulled out two straps of $100 bills that contained a total of $4,000 and tossed them in the window. Erwin said that she saw the man's face as he pulled his mask back and put it back on; the man then took the money and left. Erwin explained the bank surveillance video as part of her testimony. She did not positively identify appellant in court as the man in the bank that day, but she verified that the surveillance was accurate.

Another bank employee, Greg Smith, was present working the drive-through window; he heard the interaction and heard someone say, "He has a gun," but he did not personally observe the robbery. Smith saw the robber get into his car to leave, and he was able to describe the license plate. Another bank employee, Chris Abbot, testified about observing the robbery, hearing the man call Buzbee a "stupid bitch," and seeing Erwin throw the money toward the man before he left.

Detective Cody Brown detained appellant after he was stopped approximately an hour after the robbery driving a vehicle matching the description given—a black 2012 Toyota Corolla, license plate 198 SRG. At the time he was pulled over, appellant said that he had not been on Camp Robinson Road that day although Brown had not mentioned that road.

Detective Gibbons testified at trial that he conducted appellant's interview and explained a summary of events similarly to his description at the suppression hearing. Gibbons said that appellant did not immediately confess to the robbery but spent most of the conversation wondering whether he could get a bond and go home. Gibbons said he told appellant "over and over" that he could not promise anything—including a bond—if he made a statement and explained that this was being investigated as an aggravated robbery. A portion of the audio-recorded interview was played, and transcripts of that portion were provided to the jury.

Gibbons said that appellant had gone that day to the Metropolitan Bank on McCain Boulevard at 11:30 a.m. and at 3:29 p.m.; to the Metropolitan Bank on JFK at 4:02 p.m.; and then to the Bank of the Ozarks on Camp Robinson Road at 4:11 p.m. The banks were in close proximity to one another, and appellant was stopped about five miles away from the bank that was robbed. He was found with over $2,700 on his person. Gibbons explained the process of putting the photo lineup together and showing it to Pannell, who identified appellant "in about three seconds."

After the State rested, appellant's attorney moved for directed verdict, asserting that the State had failed to prove that appellant was the man who robbed the bank, and further failed to prove that he was armed with a deadly weapon or represented by words or conduct that he was so armed. The State argued in response that appellant admitted that he had a fake gun, that he went to this bank, and that he took the money; that bank surveillance showed him committing the robbery; and that one bank teller he saw that afternoon positively identified

SLIP OPINION

appellant. The trial court denied the motion for directed verdict. Appellant rested and renewed all his motions, which were all denied by the trial court. The jury found appellant guilty of aggravated robbery and theft of property. This appeal followed.

Appellant first contends that the trial court committed reversible error by denying his motion for a directed verdict. This court treats a motion for a directed verdict as a challenge to the sufficiency of the evidence. *Hinton v. State*, 2015 Ark. 479, 477 S.W.3d 512. On appeal from a denial of a motion for a directed verdict, the sufficiency of the evidence is tested to determine whether the verdict is supported by substantial evidence, direct or circumstantial. *Davis v. State*, 2013 Ark. App. 658, 430 S.W.3d 190; *Wyles v. State*, 368 Ark. 646, 249 S.W.3d 782 (2007). In determining whether there is substantial evidence, this court reviews the evidence in the light most favorable to the State and considers only that evidence which supports the verdict; we consider all evidence whether it was admitted correctly or erroneously. *Eichelberger v. State*, 323 Ark. 551, 916 S.W.2d 109 (1996). Substantial evidence is that evidence which is of sufficient force and character to compel a conclusion one way or the other beyond suspicion or conjecture. *Turner v. State*, 2014 Ark. 415, 443 S.W.3d 535. The jury is free to believe all or part of a witness's testimony, and we do not weigh the credibility of witnesses on appeal, as that is a job for the fact-finder and not the appellate court. *Hinton*, *supra*.

A person commits robbery if, with the purpose of committing a felony or misdemeanor theft or resisting apprehension immediately after committing a felony or misdemeanor theft, the person employs or threatens to immediately employ physical force

8

upon another person. Ark. Code Ann. § 5-12-102(a) (Repl. 2013). A person commits aggravated robbery if the person commits robbery as defined in section 5-12-102(a) and is armed with a deadly weapon, represents by word or conduct that he or she is armed with a deadly weapon, or inflicts or attempts to inflict death or serious physical injury upon another person. Ark. Code Ann. § 5-12-103. Additionally, Arkansas Code Annotated section 5-36-103(a) states that a person commits theft of property if he knowingly:

> (1) Takes or exercises unauthorized control over or makes an unauthorized transfer of an interest in the property of another person with the purpose of depriving the owner of the property; or

> (2) Obtains the property of another person by deception or by threat with the purpose of depriving the owner of the property.

Viewed in the light most favorable to the State, there was substantial evidence to support the jury's verdicts. There was eyewitness testimony and bank surveillance to support the conclusion that a man looking very similar to appellant, wearing a mask, had entered the Bank of the Ozarks, pulled out a gun, pointed it or at least showed it to one of the tellers, and took $4,000. A teller at a nearby bank positively identified appellant as the masked man who was at her bank minutes prior to the robbery, wearing identical clothing and a mask, and acting very suspiciously. Appellant was detained driving the vehicle that matched the same description given by the witnesses as the get-away car. Appellant admitted in his statement to police that he had visited all three banks, that he wore a mask, that he had a fake gun with him, and that the Bank of the Ozarks teller threw the money at him. This was more than sufficient evidence for the charges to be submitted to the jury on whether the right person

was identified as the bank robber and on whether he represented that he was armed with a deadly weapon. We affirm on this point on appeal.

Next, appellant argues that the trial court committed reversible error by denying his motion to suppress statements made by him to Detective Gibbons. Specifically, appellant contends that Detective Gibbons coerced his confession through false promises and lies. Therefore, appellant argues that his resulting confession was inadmissible. We disagree.

A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. *Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003). In cases involving a ruling on the voluntariness of a confession, this court makes an independent determination based upon the totality of the circumstances. *Clark v. State*, 374 Ark. 292, 287 S.W.3d 567 (2008). We review the trial court's findings of fact for clear error, and the ultimate question of whether the confession was voluntary is subject to an independent, or de novo, determination by this court. *Id.* Any conflicts in testimony are for the trial court to resolve, as it is in a superior position to determine the credibility of the witnesses. *Id.* This court looks to see if the confession was the product of free and deliberate choice rather than coercion, intimidation, or deception. *Id.* Regarding promises of leniency, if a police officer makes a false promise that misleads the person in custody, and the person in custody gives a confession because of that false promise, then the confession has not been voluntarily, knowingly, and intelligently made. *Id.* In determining whether there has been a misleading promise of reward, we look at the totality of the circumstances. *Fuson v. State*,

2011 Ark. 374, 383 S.W.3d 848.

The totality is subdivided into two main components: first, the statement of the officer and second, the vulnerability of the defendant. *Id.* If the officer's statement is an unambiguous false promise of leniency, there is no need to proceed to the second step because the defendant's statement is clearly involuntary. *Id.* If, however, the officer's statement is ambiguous, making it difficult for us to determine if it was truly a false promise of leniency, we must proceed to the second step of examining the vulnerability of the defendant. *Id.* Factors to be considered in determining vulnerability include: (1) the age, education, and intelligence of the accused; (2) how long it took to obtain the statement; (3) the defendant's experience, if any, with the criminal justice system; and (4) the delay between the Miranda warnings and the confession. *Id.*

During the interview that lasted over an hour, appellant was concerned with the availability of a bond. However, Detective Gibbons testified that he did not promise appellant a bond in exchange for his confession, which was confirmed by the actual interview provided to the trial court for consideration. Our de novo review of the interview itself shows that the detective told appellant repeatedly that he could not promise a bond. There was evidence that appellant had extensive experience with the criminal justice system; appellant freely waived his Miranda rights; and appellant's interview did not last an unduly long period of time. Based on our review of the totality of the circumstances, we hold that the trial court's decision not to suppress this custodial confession is not clearly against preponderance of the evidence. *Compare Clark v. State*, *supra* (affirming denial of motion to

SLIP OPINION

suppress and holding that even if there was an ambiguous promise of leniency consisting of promising to speak to the prosecutor on Clark's behalf, Clark was not particularly vulnerable such that her free will was overborne); *Roberts v. State*, 352 Ark. 489, 102 S.W.3d 482 (2003) (affirming denial of motion to suppress confession; holding that even if officer's statement to Roberts that "we'll help" if Roberts would get this "off his chest" was an ambiguous promise of leniency, this adult man with borderline intellectual functioning detained for two hours who gave his confession not long after Miranda rights were given was not so vulnerable to warrant suppression).

Appellant also mentions, and the detective admitted, that he misrepresented some of the surrounding facts of the case, such as falsely telling appellant that more people had identified him as the robber and that traffic cameras had showed his vehicle at the scene. However, the fact that a police officer made an untrue statement during the course of an interrogation does not make an otherwise voluntary confession inadmissible. *Goodwin v. State*, 373 Ark. 53, 281 S.W.3d 258 (2008). A misrepresentation of fact does not render a statement involuntary as long as it was not calculated to procure an untrue statement. *Id*. In this case, there is no evidence to suggest that the detective was attempting to get appellant to give an untrue statement. Therefore, based on the totality of the circumstances, the trial court did not clearly err in finding appellant's statements voluntary. Accordingly, we affirm on this point.

Lastly, appellant argues that the trial court committed reversible error by denying his motion to suppress a photo identification of him by witness Kathryn Pannell. We disagree that appellant has demonstrated clear error in the trial court's ruling.

12

A trial court's ruling on the admissibility of an identification will not be reversed unless, based on the totality of the circumstances, it is found to be clearly erroneous. *Dixon v. State*, 310 Ark. 460, 839 S.W.2d 173 (1992). The trial court first looks at whether the pretrial identification procedure was unnecessarily suggestive. *Id*. An identification procedure violates due process when suggestive elements make it all but inevitable that one person will be identified as the criminal. *Bishop v. State*, 310 Ark. 479, 839 S.W.2d 6 (1992). Our de novo review of the totality of the circumstances demonstrates that the photographic lineup was not unduly suggestive. All six persons were black males with a little facial hair and very little hair on their heads; they appear to be of similar age. The detective never suggested to the witness who she should pick. She chose the suspect easily, within seconds of viewing appellant's photo, and was certain of her identification then as well as in court. Appellant does not present any compelling argument or authority to support that this lineup was unduly suggestive.

The thrust of appellant's argument on appeal is that the witness's identification of appellant was not reliable. Even if prior identifications may have been improper or suggestive, an identification will not be suppressed if indicia of reliability are found to independently exist. *Williams v. State*, 2014 Ark. 253, 435 S.W.3d 483. Reliability is the linchpin in determining the admissibility of identification testimony. *Id*. It is for the trial court to determine if there are sufficient aspects of reliability present in an identification to permit its use as evidence. *Id*. It is then for the jury to decide what weight that identification testimony should be given. *Id*.

13

When deciding whether the witness's identification was reliable, the factors to consider are (1) the prior opportunity of the witness to observe the alleged act; (2) the accuracy of the prior description of the accused; (3) any identification of another person prior to the pretrial identification procedure; (4) the level of certainty demonstrated at the confrontation; (5) the failure of the witness to identify the defendant on a prior occasion; and (6) the lapse of time between the alleged act and the pretrial identification procedure. *Kimble v. State*, 331 Ark. 155, 959 S.W.2d 43 (1998). Appellant asserts that the lapse of time between the robbery and the photo spread being presented to her—about four months—renders her identification unreliable and that she did not have sufficient prior opportunity to observe him, noting that she was at a different bank than the one robbed and that none of the other bank employees were able to positively identify appellant. Appellant has not shown reversible error.

The appellate court will not inject itself into the process of determining reliability unless there is a very substantial likelihood of misidentification. *Williams*, *supra*. Given the lack of an unduly suggestive lineup, the lapse of four months does not render her in court identification unreliable, nor is the argument compelling that she did not have the "best opportunity to make an identification." This witness was certain of her identification of appellant as the man in the Metropolitan bank, both at the time she was presented the photo spread and during trial. Appellant's arguments go to the weight of her identification, which was a matter for the jury to decide, not to the trial court's decision on admissibility. *See King v. State*, 323 Ark. 558, 916 S.W.2d 725 (1996). We see no clear error in denying appellant's motion to suppress the photographic identification made by this witness.

SLIP OPINION



Appellant's convictions are affirmed.

GLADWIN, C.J., and BROWN, J., agree.

*Alvin Schay*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Kristen C. Green*, Ass't Att'y Gen., for appellee.