Cite as 2017 Ark. App. 447

# ARKANSAS COURT OF APPEALS

DIVISION III
No.    CR–17–37

| | |
|---|---|
| | Opinion Delivered:  SEPTEMBER 13, 2017 |
| LONNIE HENRY HAMILTON, JR. <br> APPELLANT | APPEAL FROM THE LAFAYETTE COUNTY CIRCUIT COURT [NOS. 37CR-15-38, 37CR-15-40] |
| V. | |
| | HONORABLE BRENT HALTOM, JUDGE |
| STATE OF ARKANSAS <br> APPELLEE | AFFIRMED |

## KENNETH S. HIXSON, Judge

Appellant Lonnie Henry Hamilton was convicted in a jury trial of aggravated robbery and two counts of aggravated assault, and he was sentenced as a habitual offender to a total of eighty-five years in prison. Mr. Hamilton's convictions arose from the robbery of Farmers Bank & Trust (the bank) in Lewisville, Arkansas, on the afternoon of May 22, 2015. On appeal, Mr. Hamilton argues that the trial court erred in denying his motion to suppress his custodial statement, erred in denying his motion for a second mental evaluation, and erred in denying his motion for directed verdict. We find no error and affirm.

On the day of the robbery, a man entered the bank disguised with a scarf over his face and armed with a handgun. He pointed the gun at one of the tellers and demanded money. While the teller was loading money into a bag, the perpetrator pointed the gun at a nearby bank customer demanding that he put his hands up. During this confrontation, the robber fired a shot. The teller handed over the money bag, and the robber took the

bag and left the bank.  When the perpetrator reached his car he saw a man who appeared to be trying to read his license plate, and the perpetrator fired a shot in the man's direction. The robber then drove off with the money.

On the following day, the police stopped a car matching the description of the car used in the robbery.  The car was being driven by Mr. Hamilton's mother, and she gave the police permission to search her vehicle.  During the search of the car, the police found a spent shell casing in the back seat that had been fired from the same gun as the shell casing recovered from the bank.  Appellant's mother told the police that Mr. Hamilton had been driving her car on the previous day during the time frame of the robbery.

Four days after the robbery, Mr. Hamilton went to the police station and turned himself in.  Mr. Hamilton signed a waiver-of-rights form and agreed to give a statement. At the outset of the interview Mr. Hamilton was asked why he was there, and he replied that he had robbed the bank.  Mr. Hamilton then went into detail about the bank robbery. He stated that he was driving his mother's car and fired his gun out the window to make sure it worked.  Mr. Hamilton then proceeded to the bank, parked the car, entered the bank, and robbed the bank teller at gunpoint. He told the police that he fired a shot in the air after a bank customer refused to put his hands up.  He also told the police that, after he fled the bank with the money, he fired a warning shot in the direction of a man in a truck who appeared to be trying to look at his license plate.  Mr. Hamilton stated that after he committed the robbery he threw the gun in a river and abandoned the scarf and other items of clothing on a road.  Mr. Hamilton indicated that he robbed the bank to buy drugs, that he had been doing drugs since committing the robbery, but that he had run out of money.

After being charged with the crimes, Mr. Hamilton requested and was given a mental evaluation, which was administered at the state hospital by Dr. Samuel J. House. Dr. House based his forensic report on an interview and mental-status examination of Mr. Hamilton, as well as Mr. Hamilton's mental-health-treatment records and the statement he gave to the police. Dr. House diagnosed Mr. Hamilton with antisocial personality disorder, mild alcohol-use disorder, and severe cannabis- and cocaine-use disorder. However, Dr. House concluded that at the time of the alleged offenses Mr. Hamilton did not have a mental disease or defect that would have rendered him incapable of purposeful conduct, that he did not lack the capacity to appreciate the criminality of his conduct, and that he did not lack the capacity to conform his conduct to the requirements of the law. Dr. House further determined that Mr. Hamilton had the capacity to understand the proceedings against him and the capacity to effectively assist his attorney in his own defense.

Prior to trial, Mr. Hamilton filed a motion to suppress the statement he made to the police. In his motion, he alleged that due to his mental-health conditions he did not understand his rights and did not make a knowledgeable waiver. Mr. Hamilton also alleged that his constitutional rights were violated because he requested an attorney and the interview proceeded without an attorney being present.

At the pretrial suppression hearing, Officer John Rhone testified that he interviewed Mr. Hamilton after reading him his *Miranda* rights. Mr. Hamilton indicated that he understood his rights and he signed a *Miranda*-rights form, initialing each of his rights and confirming that he understood them. According to Officer Rhone, Mr. Hamilton never indicated that he wanted a lawyer or asked to stop the interview. Officer Rhone testified

that during the interview Mr. Hamilton seemed cognizant and aware, and that he described in coherent detail what had happened on the day of the bank robbery. Sheriff Obie Simms also took part in the interview, and he testified that Mr. Hamilton was very coherent and spoke in complete sentences. Sheriff Simms indicated that there was never any request for a lawyer communicated to him, and that he did not remember Mr. Hamilton requesting to do the interview on another day so he could get some sleep.

Mr. Hamilton testified that, while he was in the sheriff's office prior to the interview, he told the sheriff he wanted an attorney. Mr. Hamilton further testified that he was "high and tired," having not slept in several days, and that he told the sheriff he wanted to postpone the interview until the next day. Mr. Hamilton acknowledged that he signed the *Miranda*-rights form and that, during the interview itself, he never requested an attorney or complained about being high or needing sleep. Mr. Hamilton testified that he understood what was being asked in the interview and that he competently answered their questions the best he could. At the conclusion of the suppression hearing, the trial court denied Mr. Hamilton's motion to suppress his statement.

The case proceeded to a jury trial, and during jury selection Mr. Hamilton's counsel requested a second mental evaluation. Appellant's counsel advised the trial court that Mr. Hamilton had stated that he wanted to die, that he had taken a large quantity of his mental–health medications in an attempt to kill himself, and that he had somehow cut his wrists in front of the jury panel. Mr. Hamilton was transported by ambulance to the hospital. The trial court took testimony from the jail administrator, Theardis Early, who had transported Mr. Hamilton to trial that day. Mr. Early testified that Mr. Hamilton appeared

SLIP OPINION

fine before trial and was talking with his attorney. Mr. Early stated that, after Mr. Hamilton was taken to the hospital, the deputies observed that he was coherent and talking and it appeared that there were no major issues. The trial court ordered a recess.

When court resumed, Mr. Hamilton's counsel renewed his motion for a second mental evaluation on the grounds that Mr. Hamilton stated he wanted to die and would not assist in his defense. The trial court then took testimony from a jailer, Jimmy Clark, who testified that he had been at the hospital with appellant and that Mr. Hamilton was communicating with the hospital staff. Mr. Hamilton was released from the hospital. Mr. Early advised the trial court that, after returning from the hospital, Mr. Hamilton told Mr. Early that he wanted to continue with the trial, but would not participate and would let his attorney represent him. The trial court denied the motion for a second mental evaluation, noting that after Mr. Hamilton was taken to the hospital he was released without the need for significant treatment. The trial court noted that Mr. Hamilton had purposely absented himself from the courtroom, that the trial would proceed in his absence, and that Mr. Hamilton could be present for his trial at any time should he so choose.[1]

During the jury trial Mr. Hamilton's custodial statement was introduced into evidence. In addition, the State elicited testimony from the bank tellers and the assault victims describing the robbery and the shots fired by the perpetrator. Glen Holly was the bank customer present during the robbery, and he testified that he was standing close to the gun when it fired, causing him to very much fear for his life. Glen Moe Talley was in his

---

[1]Mr. Hamilton initially declined to be present for his trial, but he later appeared while the trial was in progress.

truck when the robber exited the bank, and he testified that the man shot at him, that the shot ricocheted off the wall near his truck, and that he was in fear.

Mr. Hamilton called Dr. Ola Dele Adebogun, a psychiatrist, and Pam Stoutt, a psychiatric nurse, as witnesses.[2] Dr. Adebogun testified that Mr. Hamilton had been a patient of his and that he had diagnosed Mr. Hamilton with schizophrenia. Dr. Adebogun had visited Mr. Hamilton that day prior to testifying, and he stated that Mr. Hamilton was psychotic and hearing voices. Dr. Adebogun, however, did not conduct a forensic examination and did not offer an opinion as to whether Mr. Hamilton was able to assist his attorney. Ms. Stoutt testified that Mr. Hamilton had been a patient of hers, and she also testified that Mr. Hamilton had reported hearing voices. Although Ms. Stoutt was not qualified to make a forensic evaluation, she felt certain that Mr. Hamilton was schizophrenic.

Dr. House, the author of the forensic report, testified that he had spoken with Mr. Hamilton that day prior to testifying. Mr. Hamilton appeared anxious and told Dr. House he did not want to come to court because he was embarrassed about the alleged offense. Mr. Hamilton also told Dr. House that he was hearing voices. Dr. House testified that he observed nothing from talking with Mr. Hamilton that changed the opinions expressed in his previous mental evaluation.

Both during the trial and at the conclusion of the trial Mr. Hamilton renewed his motion for a second mental evaluation, which the trial court denied. The jury found Mr. Hamilton guilty of the charged offenses.

---

[2]These witnesses testified outside the hearing of the jury for the purpose of appellant's renewal of his motion for a second mental evaluation.

One of Mr. Hamilton's arguments on appeal is that the trial court erred in denying his motion for directed verdict. The denial of a motion for directed verdict is treated as a challenge to the sufficiency of the evidence. *Robinson v. State*, 2016 Ark. App. 550, 506 S.W.3d 881. Although listed as appellant's third point on appeal, we are required to consider challenges to the sufficiency of the evidence prior to reviewing any asserted trial errors. *Huff v. State*, 2012 Ark. 388, 423 S.W.3d 608. The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence. *Id.* Substantial evidence is evidence that is of sufficient certainty and precision to compel a conclusion one way or the other and pass beyond mere suspicion or conjecture. *Id.* We view the evidence in the light most favorable to the State, considering only the evidence that supports the verdict. *Id.*

Mr. Hamilton's convictions were for aggravated robbery and two counts of aggravated assault. Pursuant to Ark. Code Ann. § 5-12-103(a)(1) (Repl. 2013), a person commits aggravated robbery if he commits a robbery as defined in § 5-12-102 and the person is armed with a deadly weapon. A person commits robbery if, with the purpose of committing a felony or misdemeanor theft or resisting apprehension immediately after committing a felony or misdemeanor theft, the person employs or threatens to employ physical force upon another person. Ark. Code Ann. § 5-12-102(a). Pursuant to Ark. Code Ann. § 5-13-204(a), a person commits aggravated assault if, under circumstances manifesting extreme indifference to the value of human life, he purposely (1) engages in conduct that creates a substantial danger of death or serious physical injury to another person, or

SLIP OPINION

(2) displays a firearm in such a manner that creates a substantial danger of death or serious physical injury to another person.

In arguing that there was insufficient evidence to support his convictions, Mr. Hamilton asserts that there was no eyewitness identification of him and that without his confession there was nothing to connect him with the bank robbery. However, in determining whether there is substantial evidence, we consider all the evidence whether it was admitted correctly or erroneously. *Boyd v. State*, 2016 Ark. App. 407, 500 S.W.3d 772. Therefore, although Mr. Hamilton challenges the admissibility of his custodial statement in a separate point, we consider that statement in deciding whether there was substantial evidence to support the convictions.

According to Mr. Hamilton's detailed confession, he entered the bank armed with a handgun and demanded money from one of the tellers. The teller testified that he pointed the gun at her and that she gave him a bag of money. Although the teller could not identify the masked robber, Mr. Hamilton identified himself as the perpetrator in his statement to the police. We hold that this constituted substantial evidence to support the jury's finding that, while armed with a deadly weapon, Mr. Hamilton committed a robbery, and thus that he committed aggravated robbery.

We further hold that there was substantial evidence to support appellant's two aggravated-assault convictions. Mr. Hamilton contends that neither of the alleged victims were shot or injured, and that there was a failure of proof that he intended to inflict physical injury or death. However, it was not necessary for the State to prove that Mr. Hamilton intended to cause injury or death. Instead, the elements of aggravated robbery require proof

of conduct or the display of a firearm that creates a substantial danger of death or serious physical injury to another person. We have held that pointing a loaded handgun at someone is enough to create a substantial danger of death or serious physical injury and to sustain a finding that a person committed aggravated assault. *See E.N. v. State*, 2013 Ark. App. 365; *Harris v. State*, 72 Ark. App. 227, 35 S.W.3d 819 (2000). In this case, there was evidence that Mr. Hamilton pointed a gun at a customer inside the bank and fired a shot at close range before exiting the bank and firing a shot toward a second victim, with the shot ricocheting off a wall. This conduct created a substantial danger of death or serious physical injury to the victims and was sufficient to support the jury's verdicts for both counts of aggravated assault.

We next turn to Mr. Hamilton's argument that the trial court erred in denying his motion to suppress his custodial statement. Statements arising from custodial interrogation are presumed involuntary. *Wells v. State*, 2012 Ark. App. 596, 424 S.W.3d 378. The burden is thus on the State to prove that a defendant knowingly and intelligently waived his privilege against self-incrimination and his right to an attorney and that he voluntarily made the statement. *Id.* In determining whether a waiver of *Miranda* rights is voluntary, knowing, and intelligent, we look to see if the statement was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Friar v. State*, 2016 Ark. 245. In making this determination, we review the totality of the circumstances surrounding the waiver, including the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of detention; the repeated or prolonged nature of the questioning; the use of physical or mental punishment; and statements made by the

interrogating officers and the vulnerability of the defendant. *Id*. We defer to the trial court's superior position to determine the issues of the credibility of witnesses who testify to the circumstances of a defendant's custodial statement, and we will not reverse the trial court's findings of fact unless they are clearly erroneous. *Wells*, *supra*.

Mr. Hamilton contends that his statement should have been suppressed because he was unable to understand the waiver of his constitutional rights and because the interview was conducted after he had requested a lawyer. Mr. Hamilton asserts that, at the time of the interview, he was under the influence of drugs and alcohol and had not slept in four days. Mr. Hamilton claims that he asked the sheriff to postpone the interview so that he could get some sleep, but that the sheriff talked him into giving a statement. Mr. Hamilton contends that, under such circumstances, his custodial statement should have been suppressed.

When we examine the totality of the circumstances, we conclude that there is no basis to overturn the trial court's decision. Mr. Hamilton, a high school graduate, voluntarily turned himself in to the police and agreed to give a statement. Prior to the interview, Mr. Hamilton signed a waiver-of-rights form and indicated both verbally and in writing that he understood his rights. Being a habitual offender well acquainted with the legal system, Mr. Hamilton acknowledged at the suppression hearing that through his involvement with law enforcement he had been read his *Miranda* rights numerous times and understood them. During the interview, which lasted less than an hour, Mr. Hamilton coherently described in detail his actions in committing the robbery. The interviewing officer testified that Mr. Hamilton appeared cognizant and aware.

Although Mr. Hamilton testified that he had asked the sheriff for an attorney prior to the interview, the sheriff testified to the contrary. Mr. Hamilton also testified that he was under the influence of drugs and sleeplessness that day and asked to postpone the interview. However, it is undisputed that, during the interview itself, Mr. Hamilton never requested an attorney or asked to postpone the interview so he could rest. Moreover, the trial court is not required to believe the testimony of any witness at a suppression hearing, especially that of the accused, because he is the person most interested in the outcome of the proceedings. *Leach v. State*, 2012 Ark. 179, 402 S.W.3d 517. Considering all the relevant factors, we affirm the trial court's ruling denying Mr. Hamilton's motion to suppress.

Mr. Hamilton's remaining argument is that the trial court erred in denying his request for a second mental evaluation. Dr. House performed a pretrial forensic examination and determined that Mr. Hamilton was competent to stand trial and had the capacity to understand the proceedings against him and effectively assist his attorney in his defense. However, Mr. Hamilton asserts that when the trial began ten months later he stated that he wanted to die, swallowed some medication he had saved up, and somehow cut his wrists in the presence of the prospective jurors. During the trial Dr. Adebogun, who had previously treated appellant for schizophrenia, testified that Mr. Hamilton was presently hearing voices and was psychotic. Based on his volatile behavior and the opinion expressed by Dr. Adebogun, Mr. Hamilton argues that the trial court should have stopped the trial and ordered another mental-competency evaluation.

The Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial. *Medina v. California*, 505

U.S. 437 (1992). This principle is codified at Ark. Code Ann. § 5-2-302(a) (Repl. 2013), which provides that a person lacking the capacity to understand the proceedings against him or to assist effectively in his defense as a result of mental disease or defect shall not proceed to trial so long as the incapacity endures.

A criminal defendant, however, is presumed to be competent, and the burden of proving incompetence is on the accused. *Newman v. State*, 2014 Ark. 7. It is recognized that not every manifestation of mental illness demonstrates incompetence to stand trial. *Id.* Similarly, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial. *Id.*

The statutory procedures to be followed when a defendant raises the issue of mental disease or defect are found in Ark. Code Ann. § 5-2-305 (Supp. 2015). An evaluation performed under this section does not normally require a second opinion, and further evaluation is discretionary with the trial court. *Dirickson v. State*, 329 Ark. 572, 953 S.W.2d 55 (1997). Stated simply, the State is not required to pay for a defendant to shop from doctor to doctor until he finds one who will declare him incompetent to proceed with his trial. *Id.*

Applying these principles, we hold that there was no abuse of discretion in the trial court's denial of Mr. Hamilton's request for a second mental evaluation. The trial court noted that in the first evaluation conducted by Dr. House at the state hospital Mr. Hamilton was found to be competent to stand trial, and Dr. House testified at trial that after talking with Mr. Hamilton that day his opinion had not changed. Although Dr. Adebogun noted that Mr. Hamilton was experiencing psychotic symptoms, he did not render any conclusion

12

with regard to Mr. Hamilton's competency to stand trial. As noted by Dr. House in his testimony, Mr. Hamilton was understandably anxious and nervous because he was facing serious criminal charges. Mr. Hamilton's anxiety manifested itself at trial when he exhibited volatile behavior and initially refused to be present for his defense. However, the testimony showed that while Mr. Hamilton was at the hospital after creating the disturbance in court, he was coherent and talking and was soon released without the need for significant treatment. On this record, we conclude that the trial court's denial of a second mental evaluation was not error.

Affirmed.

GLOVER and WHITEAKER, JJ., agree.

*Phillip A. McGough, P.A.*, by: *Phillip A. McGough*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.