Cite as 2019 Ark. App. 350

# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CR-18-762

|  |  |  |
|---|---|---|
|  |  | **Opinion Delivered:** August 28, 2019 |
| FREDDIE LEE JONES | APPELLANT | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. 72CR-17-3512] |
| V. |  |  |
| STATE OF ARKANSAS | APPELLEE | HONORABLE JOANNA TAYLOR, JUDGE |
|  |  | AFFIRMED |

## WAYMOND M. BROWN, Judge

A Washington County jury convicted appellant Freddie Lee Jones of aggravated robbery and being a felon in possession of a firearm. Appellant was sentenced as a habitual offender to forty years' imprisonment for the aggravated-robbery conviction and five years' imprisonment for being a felon in possession of a firearm. The sentences were to run concurrently for an aggregate prison term of forty years. Appellant appeals his convictions, arguing that the circuit court erred by denying his pretrial motion to suppress pretrial identifications of him and by denying his directed-verdict motion. We affirm.

Appellant was accused of the aggravated robbery of the Valero gas station located at the corner of Zion and Crossover Roads in Fayetteville on October 20, 2017. When the Fayetteville Police Department (FPD) could not find a suspect, they turned to Facebook. An edited copy of the surveillance video of the robbery was posted to FPD's Facebook page

around October 30, 2017, to find leads.[1] FPD subsequently received an anonymous tip naming appellant as the suspect. Appellant was arrested and charged with aggravated robbery and being a felon in possession of a firearm. He filed several pretrial motions to exclude evidence, including the pretrial identifications of him by two witnesses. A motions hearing took place on May 23, 2018.

Detective Nick White of the FPD testified that he was the lead investigator on the Valero robbery case. He stated that he processed the scene and spoke with the victim, Manish Patel. He also said that he collected surveillance footage of the robbery on October 21, 2017, the day after the robbery. He testified that he did not identify any specific person as a suspect at that time. He stated that two patrol officers had canvassed the area and come up with two potential persons of interest, but they were eventually ruled out. Detective White stated that FPD's community-oriented policing division posted the surveillance video to the public on the FPD's Facebook page. He said that instead of "having the actual audio from the surveillance footage[,] we had a scary music video soundtrack to it." He stated that he did not get any tips or develop any information about who the suspect was between the time of the robbery and the time of the Facebook post. He admitted that he had developed a suspect of his own but ruled him out based on the presence of tattoos on the person's wrists that were not present in the surveillance video. He testified that he received an anonymous call naming appellant as the suspect after the video had been posted to Facebook. He stated that the caller was female and that she gave specific information as to

---

[1]The audio from the robbery was removed and replaced with a sample of the music soundtrack from *Halloween*.

why she believed appellant was the suspect, where he lived, and with whom. He said that no one else called in any tips or information about the robbery. Detective White stated that the informant left a voicemail for him but called back and spoke to him directly. He said that he did not have contact with the informant again until about a week before the hearing. He testified that the prosecutor told him that the informant was Haylie West, Natasha Marquez's daughter. He stated that based on the tip, he asked patrol officers to go to appellant's residence at 804 South Erika and attempt to locate either appellant or his girlfriend, Marquez, so that they could be interviewed. He said that he eventually interviewed both of them. He said that Marquez was aware that appellant was the person he was investigating for the robbery.

Detective White stated that he spoke with Jarren Brown, appellant's cousin, following Brown's arrest on unrelated narcotics charges. He stated that Brown requested to speak to him the day Brown was arrested and that Brown indicated appellant was the person on the video. He said that Brown stated that Marquez had shown him the Facebook post and that it was "definitely [his] cousin" on the video. Detective White testified that he and Brown viewed the surveillance video later, after Brown had already identified appellant as the person. He stated that Brown identified appellant on the surveillance video by appellant's stature, appearance, and voice.

Detective White testified that appellant was initially arrested on an unrelated warrant. He stated that he interviewed Marquez, and she gave statements concerning appellant's involvement in the robbery. He said that Marquez's statements included intimate details that had not been released to the public, including the fact that the victim would not stop

3

eating peanuts. He stated that appellant was then arrested on the robbery charge. He said that Marquez denied any involvement at the time and was released.

On cross-examination, Detective White stated that he spoke with Marquez three separate times before she was arrested. He said during the first interview, Marquez identified appellant as the robber. In the second interview, Marquez stated that the victim would not stop eating peanuts, that appellant had to fire his weapon twice, and that the victim would not give appellant the money. According to Detective White, in the third interview, Marquez admitted being the driver on the night of the robbery and gave information about where she parked during the commission of the robbery. He said that Marquez told him that appellant had taken the weapon to Brown's residence. The narcotics detectives were subsequently involved and conducted a controlled buy at Brown's residence. A search warrant was issued, and Brown was arrested. He stated that Brown denied having the weapon but stated that appellant had approached him about buying the weapon. He testified that after Brown heard the voice on the video, Brown said "without a doubt that it was [appellant's] voice." Detective White said that Brown was never charged for the robbery.

Jarren Brown testified that he was arrested on November 7, 2017, for simultaneous possession of drugs and firearms. He said that Detective White asked him about the gun used in the robbery but that he did not have the gun or anything to do with the robbery. He stated that he received a copy of the Facebook post from Marquez and that he initially thought it was a joke or something. He stated that when Detective White showed him the Facebook post after his arrest, he told Detective White that "it kind of looked like [his] cousin," based on appellant's build and stature.

On cross-examination, Brown stated that he had known appellant nearly his entire life. He said that he had spent a lot of time with appellant and was familiar with the way appellant carried himself and with his voice. He testified that appellant approached him trying to sell a black .38 revolver. He stated that before he watched the video with appellant's voice on it, he thought it was appellant by the way the suspect walked. He denied receiving help in his criminal case from Detective White, stating that if he had received help, he would have been able to get out of jail without making bond.

Haylie West testified that she was familiar with the Facebook post of the robbery. She said that her aunt, Treva Parker, first showed her the video and suggested that it was appellant on the video. She said that she was unaware that the FPD had posted the video when she first saw it. She stated that she watched the video at least ten times to make "absolutely certain that it was [appellant]." She testified that after the watching the video, she was 100 percent sure it was appellant. She stated that she talked to her younger sister, A.K., before calling in the tip. She said that A.K. had lived in the house with appellant from March until November 2017. She stated that she knew appellant "fairly well" and saw him about once a week when she came to see Marquez and that she had stayed the night a couple of times. She testified that she "hung out" with appellant fifteen to twenty times between March and November. She stated that she was able to identify appellant as the person in the video based on his walk, hair, height, and work boots. She said that she initially had concerns about the weight of the robber until she noticed how small the robber's wrists were and realized that the robber could have been wearing extra clothing. West stated that she left a voicemail for Detective White the night she watched the video

and that she called again the next day after showing the video to her other sister. She said that one of her sisters had also recognized the damaged backpack carried by the robber as the one appellant carried. She testified that when she watched the unedited video about a week before the hearing, she knew it was appellant.

On cross-examination, West testified that she thought appellant was the robber from the first time she saw the video. She said that she watched it several times because she wanted to make sure before calling the police because she did not want to "accuse someone falsely." She stated that she asked her sister to watch the video, and her sister identified appellant as the robber and said that appellant had that Under Armour backpack that would not zip. She said that she did not know her mother was in trouble when she gave the tip, but that she reported appellant as the robber because it was "the right thing to do." She stated that after hearing the robber's voice, she was more confident that it was appellant.

On redirect, West stated that she used her phone to take a picture of appellant and put it side by side to the person in the video the day she spoke to Detective White. She testified that she was "certain that [her] information was correct. Taking the photo was more just for [her]." On recross, she stated that she was sure it was appellant the first time she saw the video and that she would not have called the police unless she was absolutely sure.

The court heard counsels' arguments, and at the conclusion of the hearing, ruled that the pretrial identifications would not be excluded.

Appellant's jury trial began May 23, 2018. Officer Justin George of the FPD testified that he answered the robbery call on October 20, 2017, at the Valero gas station. He stated

6

that he was able to watch surveillance video of the robbery while at Valero that night and that he saw a black male dressed in black pants, a black plaid shirt with white stripes, tan boots, and a mask enter the store and commit the robbery. He said that he gave a description of the suspect but that no one was found that night.

Manish Patel testified that he is the owner of the Valero in question and that he was working the night of October 20, 2017. He stated that a black man came into the store with a gun and demanded money. He said that the robber asked for money as he approached the register, fired a shot, reached over in the register, said something about "killing" him, hit Patel's cell phone with the gun, fired another shot, and turned and left the store. He stated that the robbery was "really quick." He said that he was eating peanuts as the robber approached the register. He testified that the robber took approximately $415 or $416. He said that the store had surveillance that captured the robbery and that he was able to give a copy of the surveillance video to Detective White.

Detective White testified that he worked the robbery on the night of October 20, 2017. He stated that the video showed that the robber had fired his weapon two times and that he was able to recover one .38 caliber projectile in the store. He said that the other bullet exited the roof and was not recovered. He testified that there were three men initially developed as suspects, but they were cleared. He said that the decision was later made to post the video to FPD's Facebook page. He said that he received his first call from an anonymous caller on October 30, 2017, indicating appellant as the robber. He stated that he sent patrol officers to appellant's residence and, that although there were people inside, it was quite some time before Marquez and Jodi Truesdale came to the door, claiming to

7

have been in the shower together. Marquez denied that appellant was at the residence but eventually stated he was there. It took about another thirty minutes before appellant and two others exited the residence. He stated that appellant was transported to the police department. He said that Marquez gave him permission to search the residence, but no evidence related to the robbery was found. Detective White said that Marquez and Truesdale agreed to come to the police department to make statements. He stated that he concluded after his first interview with Marquez that she was not involved. He testified that a weapon was found in Brown's residence, but it was not the revolver used in the robbery.

On cross-examination, Detective White stated that when they received the tip regarding appellant, FPD did not have any leads. He said that when Brown was arrest, FPD believed that he was either involved in the robbery or had information about it. He testified that he got word from another detective following Brown's arrest that Brown wanted to speak to him. He stated that he spoke with Marquez three times and arrested her for the robbery after the third interview.

Truesdale testified on direct that she and Marquez had been friends for about ten years. She said that on the day officers came to appellant's residence, appellant told them not to open the door. She stated that appellant subsequently made them answer the door in towels once he realized that the police were not going to leave. On redirect, she stated that she told Detective White that she believed Marquez was the getaway driver in the robbery.

Corporal Evan Anderson testified that he went to appellant's residence on November

1, 2017, at the request of Detective White. He stated that he could tell there were people inside the residence because he could hear voices. However, he said that no one answered when he knocked. He stated that it was several hours between the time he first knocked on the door and when appellant came out of the residence.

West testified that Marquez is her mother and that appellant is Marquez's boyfriend. She said that she met appellant within a couple weeks of Marquez's meeting him in March 2017. She stated that she was at Marquez's home about once a week between March and August 2017; she said she was there about once a month when school started. She testified that she had met appellant about twenty times. She stated that her aunt saw the Facebook video of the robbery and showed it to her. She said that she recognized appellant in the video and contacted police. She testified that she initially did not see who had posted the video. She said that she later found it on her phone on FPD page. She stated that the man in the Facebook video walked like appellant, was appellant's height, was appellant's weight, and had the same hairstyle as appellant. She also said that she noticed the shoes worn by the robber. She testified that after she realized the robber was appellant, she conferred with her sister and then called in the tip. She stated that she left a voicemail for Detective White concerning the robbery. She said that she watched the video at least ten times before calling in the tip but that she was sure appellant was the robber after the first time she saw the video. She stated that when she recently heard the video with audio, she was even more sure that appellant was the robber. She testified that she had taken a picture of appellant when her sister was in the hospital having a baby to compare it to the person in the Facebook video after she spoke with Detective White for her "own justification." She said that after taking

9

the photo, she was "definitely more certain it was [appellant] in the video."

On cross-examination, West testified that she saw appellant only once or twice between August and November. She said she called in the tip because she believed appellant was the robber. She said that she was certain about appellant being the robber initially and that her taking the photo and subsequently hearing the robber speak made her more certain.

Brown testified that he and appellant are cousins and have known each other their whole lives. He stated that appellant tried to sell him a black short-nose .38 revolver for sixty-five dollars but that he did not buy it because when he opened it, there were two shells missing and the gun was worth $250. Brown stated that he had spent a substantial amount of time with appellant and that he was familiar with appellant's walk, hairstyle, build, and voice. He stated that the man in the Facebook video looked like appellant and that he told Detective White as much when he viewed the video with him. He stated that once he heard the robber's voice, he was more confident that it was appellant.

On cross-examination, Brown stated that after his arrest, Detective White asked him what he knew about the Valero robbery. He stated he told Detective White that appellant had tried to sell him a gun but that he did not buy it. On recross, Brown stated that appellant tried to sell him the gun around October 23, 2017.

Marquez testified that she and appellant are in a relationship and had lived together for a year. She stated that when officers knocked on her door looking for appellant, appellant told her not to answer. She said that appellant then became "frantic" and told her and Truesdale to "act like [they] were in bed together so that way it would look like that's why [they] did not answer the door . . . because [they] were taking a shower together[.]"

She stated that she initially lied about appellant's being there. She said that Detective White showed her the Facebook video when she went outside and that she told Detective White appellant was the person in the video.[2] She stated she told Detective White that appellant told her that the "store owner was eating peanuts and didn't flinch a bit when [appellant] was in there." She said that appellant finally exited the residence after a brief standoff. She testified that she gave officers permission to search the residence. She stated she told Detective White that appellant told her he had robbed the gas station and that he had to fire his gun twice because the man would not give appellant the money. She said that she denied any involvement at that time but stated that appellant had used her red Chevy truck. She admitted she had lied about appellant taking her truck and that she had driven appellant. However, she stated that when she got into the truck, she did not know where she was going. She said that appellant told her to drive on Crossover, make a left onto Piney Ridge, and drive all the way to the back of the parking lot. She stated that she parked and cut off her engine and that appellant was "rustling around stuff in his backpack and got out of the truck." She testified that appellant told her to wait for him. She stated that appellant had a black backpack with a broken zipper but that she did not know what was inside the backpack. She denied having any knowledge of why they were there. She stated that she did not see which direction appellant went because she was looking at Facebook on her phone. She also denied knowing whether appellant had a mask and a gun. She testified that she decided to leave appellant after about ten minutes and that when she got to the stop

---

[2]Detective White had no recollection of this.

sign at Crossover, appellant came out of the bushes and jumped into the truck. She said that appellant was "hyperventilating and couldn't breathe and said just drive, just drive." She stated that appellant dumped his clothes in a dumpster on Electric Avenue near Brown's house. She said that she did not see anything else appellant had but stated that he counted $417 in cash. She stated that appellant told her that the man behind the counter was Middle Eastern or Indian. She testified that they paid her phone bill at Walmart on Mall Avenue after appellant changed clothes, and then they went home. She said that she never saw a firearm, but she saw appellant wrapping something in a T-shirt and taking it to Brown's house. She admitted that she had been charged as an accomplice to the robbery in this case. She identified the voice on the surveillance video as appellant's.

The State rested its case and appellant made a motion for directed verdict. In the motion, appellant argued that there was a "lack of sufficient testimony on who the identity of the person who perpetrated the act was." More specifically, he argued that "there's no evidence from the officers or the victim that [appellant] was the person who committed the act and that Mr. Brown and Ms. Marquez's testimony was as an accomplice." He further argued that "Ms. West's identification is not sufficiently reliable for there to be substantial corroborating evidence to allow this case to go to the jury." The court denied the motion. Appellant also unsuccessfully renewed his suppression motions. The jury found appellant guilty as charged and sentenced him as a habitual offender to forty years' imprisonment. On appeal, appellant contends that the circuit court erred by denying his (1) pretrial motion to suppress pretrial identifications of him and (2) directed-verdict motion.

As his second point of appeal, appellant challenges the sufficiency of the evidence

12

supporting the verdict. We address this issue first because of double-jeopardy concerns.[3] In reviewing sufficiency challenges, all the evidence, including that which may have been inadmissible, is considered in the light most favorable to the State.[4] We examine all the evidence submitted before we address alleged trial error.[5] We review the evidence in the light most favorable to the State as the prevailing party and affirm if the conviction is supported by substantial evidence.[6] Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resort to speculation or conjecture.[7]

Appellant contends that his convictions should be reversed because "some of the most significant testimony proffered at trial connecting [him] to the crime was from Ms. Natasha Marquez, who was charged as an accomplice to the crime." Arkansas law provides that a person cannot be convicted based on the testimony of an accomplice "unless [the testimony is] corroborated by other evidence tending to connect the defendant . . . with the commission of the offense."[8] Corroboration must be evidence of a substantive nature, since it must be directed toward proving the connection of the accused with the crime and

[3]*Drennan v. State*, 2018 Ark. 328, 559 S.W.3d 262.

[4]*Britt v. State*, 2015 Ark. App. 456, 468 S.W.3d 285.

[5]*Briggs v. State*, 2015 Ark. App. 364, 465 S.W.3d 24.

[6]*Id.*

[7]*Id.*

[8]Ark. Code Ann. § 16-89-111(e)(1)(A) (Supp. 2017).

not directed toward corroborating the accomplice's testimony.[9]  The corroboration is not sufficient if it merely shows that the offense was committed and the circumstances thereof.[10]  The test for corroborating evidence is whether, if the testimony of the accomplice were totally eliminated from the case, the remaining evidence independently establishes the crime and tends to connect the accused with its commission.[11]

Appellant was convicted of the October 20, 2017 aggravated robbery of the Valero gas station.  Manish Patel testified that he is the owner of the Valero in question and that he was working the night of October 20, 2017.  He stated that he was robbed of close to $415 or $416 by a black man with a gun.  He also said that the man made a reference about "killing" him and fired his weapon twice.  Officer Justin George testified that he answered the robbery call and was able to watch surveillance video of the robbery while at Valero that night.  He stated that in the video he saw a black male dressed in black pants, a black plaid shirt with white stripes, tan boots, and a mask enter the store and commit the robbery.  He said no one was found that night.

Detective Nick White testified that he was lead detective in the robbery and that he was unable to develop a suspect.  He stated that FPD was able to recover a .38 caliber shell casing at the scene of the robbery.  He said that the decision was subsequently made to post the surveillance video on FPD's Facebook page to find leads.  He stated that he received an

---

[9]*Meadows v. State*, 2012 Ark. 57, 386 S.W.3d 470.

[10]Ark. Code Ann. § 16-89-111(e)(1)(B).

[11]*MacKool v. State*, 365 Ark. 416, 231 S.W.3d 676 (2006).

14

anonymous call from someone, later identified as Haylie West, naming appellant as the suspect and indicating that he could be located at Natasha Marquez's residence. Detective White subsequently made contact with Natasha Marquez, who eventually admitted being the getaway driver for appellant and told Detective White intimate details about the robbery, including the fact that the victim was Middle Eastern or Indian and would not stop eating peanuts and that appellant fired the gun twice during the robbery. She also indicated that appellant counted $417 from the robbery.

Haylie West indicated that she had known appellant for several months because he dated her mother, Marquez. She stated that she had been around appellant approximately twenty times and that she was familiar with his build, walk, height, hairstyle, and voice. She stated that when she saw a video of the robbery, she immediately knew that appellant was the robber. She said that she watched the video about ten more times, talked with her little sister, and then called in the tip. She said that the next day, she talked to her other sister and called again, this time speaking to Detective White. She stated that after she made the tip, she took a picture of appellant and placed it next to the image of the suspect in the video for her benefit to ensure that she had not turned in an innocent man. She testified that about a week before trial, she was able to see the surveillance video that included audio and was even more sure that the person in the video was appellant.

Jarren Brown stated that he could identify appellant from the Facebook video because he and appellant are cousins and he has known appellant his whole life. He said that he is familiar with appellant's hairstyle, walk, voice, and build. He stated that shortly after the robbery, appellant attempted to sell him a black short-nosed .38 caliber revolver that was

15

missing two shells. He said that he did not buy the weapon because it was missing the shells, and it was worth more than what appellant was attempting to sell it for. He said that he was arrested for drugs and firearms and ended up speaking with Detective White following his arrest. He identified appellant in the Facebook video, and when he heard the surveillance video with audio, he was sure that it was appellant's voice.

Excluding Marquez's [12] testimony, the remaining evidence independently establishes the crime of aggravated robbery and tends to connect appellant with its commission. Therefore, we affirm on this point.

Appellant also argues that the court erred by not granting his motion to suppress pretrial identifications of him. A circuit court's ruling on the admissibility of an identification will not be reversed unless the ruling was clearly erroneous.[13] In determining the admissibility of a pretrial identification, the circuit court first looks at whether the identification procedure was unnecessarily suggestive.[14] An identification procedure violates due process when suggestive elements make it all but inevitable that one person will be identified as the criminal.[15] Even when the process is suggestive, the circuit court may conclude that, under the totality of the circumstances, the identification was sufficiently

---

[12]Appellant argued below that Brown was also an accomplice. However, he does not make that argument on appeal and it is now considered waived.

[13]*Boyd v. State*, 2016 Ark. App. 407, 500 S.W.3d 772.

[14]*Id.*

[15]*Id.*

reliable for the matter to be decided by the jury.[16]

In determining the reliability of a pretrial identification, the following factors are considered: (1) the prior opportunity of the witness to observe the alleged act; (2) the accuracy of the prior description of the accused; (3) any identification of another person prior to the pretrial identification procedure; (4) the level of certainty demonstrated at the confrontation; (5) the failure of the witness to identify the defendant on a prior occasion; and (6) the lapse of time between the alleged act and the pretrial identification procedure.[17]

Appellant argues that the pretrial identifications of him should have been excluded because the victim could not identify him, and the prime witness who led police to him had no opportunity to witness the crime other than what she saw on the FPD Facebook page. This argument is without merit. The victim could not identify the suspect because he was wearing a mask at the time of the robbery. Police had unsuccessfully tried to locate a suspect before turning to Facebook. Although West was not present when the crime was committed, she was familiar with appellant and had been around him about twenty times when she concluded that appellant was the robber. She never identified anyone else as the robber, and she never changed her mind. Additionally, she contacted FPD the same day she saw its Facebook video and named appellant as the robber. She informed Detective White she believed that appellant was the robber based on his walk, hair, height, and work boots. She said that she initially had concerns about the weight of the robber until she noticed how small the robber's wrists were and realized that the robber could have been

---

[16]*Smith v. State*, 2015 Ark. App. 418, 467 S.W.3d 750.

[17]*Williams v. State*, 2017 Ark. App. 198, 517 S.W.3d 446.

wearing extra clothing. She indicated that she was 100 percent sure that appellant was the robber. Approximately a week before the hearing, West was shown the surveillance video with the audio and was again certain that appellant was the robber. The circuit court found that the pretrial-identification procedure was not unnecessarily suggestive, and we agree. There was nothing on the part of FPD that made it all but inevitable that appellant would be identified by West, or anyone else, as the criminal.[18] Accordingly, we affirm.

Affirmed.

GLADWIN and VAUGHT, JJ., agree.

*Laura Avery*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Karen Virginia Wallace*, Ass't Att'y Gen., for appellee.

---

[18]Although appellant argued below that Brown's pretrial identification should also be excluded, he did not make that argument on appeal, and it is now considered waived. Appellant also did not challenge any of the witnesses' in-court identifications of him.