Cite as 2025 Ark. 22

# SUPREME COURT OF ARKANSAS

**No.** CR-24-477

| | |
|---|---|
| BILLY MICHAEL NELSON<br><br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br>APPELLEE | **Opinion Delivered:** March 13, 2025<br><br>APPEAL FROM THE UNION COUNTY CIRCUIT COURT [NO. 70CR-23-140]<br><br>HONORABLE SPENCER G. SINGLETON, JUDGE<br><br><u>AFFIRMED</u>. |

**BARBARA W. WEBB, Justice**

Appellant Billy Michael Nelson was convicted of rape of a minor less than fourteen years of age. Because he had previously been convicted of rape, he received a mandatory sentence of life imprisonment. Ark. Code Ann. § 5-4-501(c)(3) (Repl. 2024). For reversal, Nelson argues that the circuit court erred by denying his motion to suppress his custodial statement. We affirm.

## I. *Background*

On February 9, 2023, ten-year-old Minor Victim ("MV") told her friend that she had "hickeys" on her chest; her friend, in turn, told their teacher. MV's mother was notified by the school and MV was taken to the hospital. There, MV received an examination for sexual assault. The Union County Sheriff's Office was dispatched to the hospital to take MV's statement and photograph the markings on MV's chest. MV stated that her neighbor,

Nelson, gave her the hickeys. She explained that Nelson had sex with her while she was at his house doing homework.

On September 25, 2023, the State filed the operative criminal information in this case charging Nelson as a habitual offender with one count of rape of MV. Following Nelson's arrest, he was interviewed by Sergeant Jim Sanders. At the outset, Nelson was Mirandized, and he signed a waiver of his rights.

Sergeant Sanders explained to Nelson that he had been arrested on a felony warrant for raping MV. He told Nelson that he had "substantial evidence to prove that something probably happened" but wanted to get Nelson's "side of the story."

Nelson stated that he lived with his sister in a trailer behind MV's house. MV would come over to Nelson's home after school to do homework. He explained that he would help MV with her homework. Nelson admitted that they would normally work on MV's homework in his bedroom with the door shut.

Sergeant Sanders asked, "[A]t what point did it become a little bit more physical with you and [MV]?" Nelson replied that MV began lifting her shirt up and he told her to put it back down. Sergeant Sanders then asked about the hickeys on MV's chest, and Nelson initially denied causing them. Sergeant Sanders replied, "I don't think you're a bad person. I'm just trying to figure out why this happened. Now, I know it happened. I know it did. I have kits with your DNA where it shouldn't be. Okay?" He added that he was trying to get Nelson's "side" of the story and asked if MV was "promiscuous." Nelson agreed that MV was promiscuous.

Sergeant Sanders followed up by asking what MV did to make Nelson believe she was promiscuous. He added, "I can't help you if I don't know the whys." Nelson responded, "[S]he had told me if I didn't, she was going to tell her daddy that I did." Sergeant Sanders asked for further clarification, "Help me poke holes in her story." Nelson then explained that MV told him that if he "didn't play with her boobies . . . that she was going to tell her daddy that I did." He then stated that MV put his face into her chest, and he commented that his nose could have caused MV's bruises.

Nelson further remarked, "What good is this going to do me?" Sergeant Sanders replied, "I can't help you unless you tell me the whole truth." He suggested that a truthful statement from Nelson could allow him to question MV about the allegations and her purported threats.

Later in the interview, Nelson asked, "[MV]'s trying to say that I had sex with her?" Sergeant Sanders replied, "Yeah. Anally to be specific." He added:

> The medical exam shows that there is trauma. . . . I can't wrap my head around the fact that that didn't happen also. . . . Before I go—before we go to court today, and I go to the prosecutor or the judge, and they ask me, was he honest? Was he—did he come forward and everything else? You know, right now I can say, I feel like he's come forward honestly on some of it. So—and of course when the DNA results come back and everything else from this kit, and for the medical examination that was taken care of at the Child Advocacy Center, I want to be able to kind of block that before it even gets here.

At this point, Nelson admitted that he used his finger to penetrate MV's anus. He also admitted that MV touched his penis and that he put his penis in her mouth.

Prior to trial, Nelson moved to suppress his custodial interview, contending that his statement was involuntary and coerced. He pointed to Sergeant Sanders's statements that he had "examinations done" from rape kits; "I have kits with your DNA where it shouldn't

be"; and "I can't help you unless you are . . . truthful." After a hearing, the circuit court denied Nelson's motion to suppress. Nelson was subsequently convicted of rape and sentenced to a mandatory term of life imprisonment. He now appeals.

## II. *Discussion*

On appeal, Nelson challenges the circuit court's denial of his motion to suppress his custodial statement. He contends that his statement was coerced and involuntary due to the interrogating officer's deceit, misrepresentations, and promises of help. When we review a circuit court's denial of a motion to suppress, we make an independent determination based on the totality of the circumstances. *Pree v. State*, 2019 Ark. 258, 583 S.W.3d 380. We will reverse the circuit court's ruling only if it is clearly against the preponderance of the evidence. *Conway v. State*, 2016 Ark. 7, 479 S.W.3d 1. A statement while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily. *Fritts v. State*, 2013 Ark. 505, 431 S.W.3d 227.

Nelson's challenge can be separated into two distinct arguments. First, he claims that Sergeant Sanders coerced his confession by misrepresenting the strength of the State's case. In particular, he asserts that Sergeant Sanders lied to him about having DNA evidence and medical-examination findings of trauma.

The fact that a police officer makes an untrue statement during the course of an interrogation does not necessarily render an otherwise voluntary statement inadmissible. *Goodwin v. State*, 373 Ark. 53, 281 S.W.3d 258 (2008). We have found no fault with an interrogator trying to persuade an accused to tell the truth or to answer questions, even

4

though the interrogator may have made misrepresentations of fact, so long as the means employed are not calculated to procure an untrue statement and the confession is otherwise voluntarily made. *Friar v. State*, 2016 Ark. 245. There is no indication in this case that the purported misrepresentations by police were calculated to procure an untrue statement from Nelson. Rather, the record reflects that at the time of Nelson's interview, Sergeant Sanders had already interviewed MV, and his repeated comments that he knew what happened suggested he believed MV's account. As such, Sergeant Sanders's tactic was intended to procure an accurate statement from Nelson.

Nelson next claims that his statement was coerced through false promises of help. He points to Sergeant Sanders's statements that he was trying to "poke holes" in MV's allegations and that he could not "help" Nelson without knowing "the whys" and without Nelson telling the "whole truth." According to Nelson, these statements constituted unambiguous promises of leniency.

It is well settled that a statement induced by a false promise of reward or leniency is not a voluntary statement. *Fuson v. State*, 2011 Ark. 374, 383 S.W.3d 848. We have adopted a two-stage inquiry for instances in which defendants allege that false promises by police officers induced their custodial statements. *Kellon v. State*, 2018 Ark. 46, 538 S.W.3d 206. First, we look at the nature of the officer's statement. *Id.* If the officer made an unambiguous, false promise of leniency, then the statement elicited from the defendant is automatically inadmissible; if the officer made no promises of leniency, the statement is admissible. *Id.* If the officer's statements were of an ambiguous nature, however, we proceed to the second step of the analysis to examine the defendant's vulnerability. *Id.* Factors to be considered in

5

determining vulnerability include: (1) the age, education, and intelligence of the accused; (2) how long it took to obtain the statement; (3) the defendant's experience, if any, with the criminal justice system; and (4) the delay between the *Miranda* warnings and the confession. *Fuson, supra.*

Despite Nelson's contention, Sergeant Sanders's statements to "poke holes" and "help" are not unambiguous promises of leniency. We have demanded a degree of specificity not present here. For example, in *Teas v. State*, 266 Ark. 572, 574, 587 S.W.2d 28, 29 (1979), we reversed the circuit court's decision to admit a confession that was obtained after officers offered to reduce the defendant's hearing bond and to make recommendations to the prosecutor. These promises were made in exchange for the defendant's confession. Here, Sergeant Sanders made no specific representations to Nelson.[1] Viewed in context, Sanders was making general statements for Nelson to be truthful in providing his account. We have found no fault with an interrogator trying to persuade an accused to tell the truth. *Friar,* 2016 Ark. 245, at 14.

To the extent that Sergeant Sanders's statements are regarded as ambiguous, we consider Nelson's vulnerability. Nelson was forty-six years old at the time of the interview, and there is no indication that he possesses below-normal intelligence. He has experience with the criminal justice system as he had previously been convicted of rape. He was given

---

[1]Nelson likens Sergeant Sanders's statements to those made in *Pyles v. State*, 329 Ark. 73, 947 S.W.2d 754 (1997), and *Tatum v. State*, 266 Ark. 506, 585 S.W.2d 957 (1979). In those cases, this court found the interrogating officers committed reversible error by telling the respective defendants they would "help him in every way in the world" and "do all [they] could to help him." *Pyles*, 329 Ark. at 77, 947 S.W.2d at 755; *Tatum*, 266 Ark. at 509, 585 S.W.2d at 958. These comments are distinguishable in that they are committed offers of assistance.

his *Miranda* warnings at the beginning of the interview, which lasted less than forty minutes. Accordingly, Nelson was not particularly susceptible to having his will overborne. *Goodwin*, 372 Ark. at 62, 281 S.W.3d at 266. Reviewing the totality of the circumstances, we cannot say that the circuit court clearly erred in refusing to suppress Nelson's confession.

### III.  *Rule 4-3(a) Review*

In compliance with Arkansas Supreme Court Rule 4–3(a), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Nelson. No prejudicial error has been found.

Affirmed.

Special Justice MARK ALLISON joins.

BRONNI, J., not participating.

*Law Offices of John Wesley Hall*, by: *Samantha J. Carpenter*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Joseph Karl Luebke*, Ass't Att'y Gen., for appellee.