Cite as 2025 Ark. App. 204

# ARKANSAS COURT OF APPEALS
## DIVISION III
### No. CR-24-500

| | |
|---|---|
| JOTAVION JATAR ROSS | Opinion Delivered April 9, 2025 |
| APPELLANT | |
| | APPEAL FROM THE CRITTENDEN COUNTY CIRCUIT COURT |
| V. | [NO. 18CR-23-38] |
| STATE OF ARKANSAS | |
| APPELLEE | HONORABLE RANDY PHILHOURS, JUDGE |
| | AFFIRMED |

**BART F. VIRDEN, Judge**

Jotavion Jatar Ross appeals his conviction by a Crittenden County Circuit Court jury of first-degree murder, arguing that the circuit court erroneously denied his motion to suppress his custodial statements, refused to give jury instructions for manslaughter and justification, and excluded the victim's toxicology report. We affirm.

### I. *Relevant Facts*

On December 29, 2022, Ross was celebrating his birthday with friends and his girlfriend at the Motel 6 in West Memphis. Ross's friend, "TJ," wanted to purchase marijuana, and Ross arranged to buy the marijuana from Samuel Johnson, Jr., at a nearby gas station. Ross accompanied TJ to buy the drugs; however, the sale did not go as planned, and Ross shot and killed Johnson.

On November 28, 2023, Ross was charged by amended information with one count of first-degree murder in connection with Johnson's death. The information included the State's request for enhancement of Ross's sentence due to his use of a firearm to commit a felony.

There were two pretrial motion hearings. At the first one, Ross moved to suppress certain statements he made during his two custodial interviews, including his confession. Ross alleged that the statements were tainted because they were coerced by the detectives, who used threats and his unfamiliarity with the justice system to obtain the statements. The court reviewed the custodial statements and ruled they were admissible. At the second hearing, Ross submitted his proposed jury instructions, including justification and the lesser-included offense of manslaughter. There was discussion regarding jury instructions in light of Arkansas's passage of the "Stand Your Ground" law. The court withheld a ruling and stated that the State could object to the instructions after all the evidence had been presented. The State also moved to exclude information from Johnson's toxicology report showing that he was positive for THC and alcohol on the evening he was killed. The State asserted that such evidence should be excluded because it tends to be prejudicial to the victim. Additionally, the State argued that the toxicology report was qualitative, not quantitative, and only showed the presence of marijuana and alcohol in Johnson's bloodstream, not whether he was intoxicated. Ross responded that the report should be admitted because the drugs and alcohol in Johnson's system were indicative of his state of mind at the time of his death and explained why Ross felt the need to defend himself. Ross

contended that even though the results did not prove that Johnson was intoxicated, any amount of THC could make someone paranoid, angsty, and more combative, which dovetailed with the justification defense. The court ruled that the potential prejudice outweighed the probative value and granted the State's motion to suppress.

On January 9, 2024, the trial was held. The State presented video evidence from various surveillance cameras in West Memphis. The videos showed that at 10:55 p.m., two individuals chased a third, followed by gunshots and screaming. Different angles of these events were provided by the Maddux Elementary School's cameras. SkyCop video from the intersection of Ingram and Barton Streets, also taken at 10:55 p.m., provided a closer view of Johnson fleeing from Ross and TJ. The video clearly showed the clothes Johnson and Ross were wearing. Patrol vehicle dash-camera footage from shortly after the murder showed the interaction between West Memphis police officers, Ross, and TJ. Surveillance footage from the Motel 6 lobby showed Ross checking in on the night of the murder at 10:19 p.m. wearing the same clothes as in the SkyCop video. Motel 6 surveillance video also captured Ross and TJ leaving the motel room at 10:35 p.m., wearing those same clothes as in the SkyCop video, and returning to their room at 11:32 p.m. wearing different clothes.

Detective Nick Anderson testified that shortly after the murder, Ross agreed to talk to the police. He was informed of his *Miranda* rights and signed the *Miranda* waiver. Video of Ross's interview by Detective Anderson and Officer Mallory Manning was played for the jury. In the video, Ross explained that on the night of Johnson's murder he was at the Motel 6 with his girlfriend, TJ, and some others celebrating his birthday. Around 10:00 p.m., he

and TJ went to the gas station. Ross denied that he knew who Johnson was or that they saw him that evening. Ross stated that a white woman came to the motel room and told them that the police were looking for them. She gave Ross a backpack right before he left the motel room, and he did not think to look in it.[1] The video shows Officer Manning informing Ross that the police had several videos of him and TJ chasing Johnson and shooting him. Ross denied that he was involved. Detective Anderson stated,

> It's your ass on the line, and you're looking at life. You need to do more than sit up here and tell us what you didn't do because we don't want to hear that shit. The camera sees it.
>
> . . . .
>
> [Y]ou fixing to sit up here and talk to us now and tell us what the hell happened because it's clear as day on video or you fixing to sit your ass in jail the rest of your fucking life until you an old-ass man and die and people carry your ass out of there in a wooden fucking box.

At this time, Ross changed his story, stating that TJ wanted to buy marijuana from Johnson, and when they met up at the gas station, TJ grabbed Johnson and tried to steal the drugs. Johnson pulled a knife on TJ, then threw it at him (Ross). Ross stated that TJ chased Johnson down the street, and TJ shot Johnson with the gun that had been found in the backpack given to him by the white woman.

Detective Chad Davis testified that Ross initiated the second interview, which he conducted. The video was played for the jury. In it, Ross was Mirandized, and he agreed to

---

[1]At the time of his arrest, Ross was carrying a small backpack containing a .45 semiautomatic pistol that was later determined to be the murder weapon.

conduct the interview without an attorney. Ross explained that he had taken a charge for stealing a car earlier that year, and now a group of young men who also had been involved in the theft were trying to pin this murder on him as well. Ross tried to explain that later in the evening, he never technically changed clothes, he just put new clothes over the clothes that he was already wearing. Detective Davis told Ross that the police had several videos of the evening in question, and it was clear that he changed clothes after the shooting. Detective Anderson joined the interview and told Ross to "[s]top this bullshitting before you get a needle stuck in your arm[.]" Detective Davis then described the video evidence to Ross that depicted him committing the crime:

> I'm going to go to the courtroom, and I'm going to play the videos that I have, and I'm going to lay out the clothes. I'm going to show the video of [TJ] telling me everything. I'm going to show the video of Cierra telling me everything, with the clothes that you were wearing along with what clothes [TJ] was wearing that matches the same clothing in the video when Samuel was murdered and the same clothing that I recovered in the same spot that [TJ] told me they would be at. [TJ] ain't lied to me so far, and I know [TJ] didn't squeeze that trigger. You did because I can see [TJ]'s pants in the video. It wasn't [TJ]. It was you.

Detective Davis explained to Ross that Johnson did not die immediately and gave the police "names." After more discussion of video evidence, Ross confessed. He explained that during the drug buy, TJ grabbed Johnson, and he (Ross) thought that Johnson had stabbed TJ. When Johnson ran, Ross feared for his life. Ross explained that Johnson knew where he lived, and he thought Johnson was going to get a gun. When Johnson reached into his jacket, Ross thought he had a gun, and he shot Johnson.

5

In addition to the video evidence, the medical examiner testified that Johnson died from the gunshot wounds, and there was testimony that Ross's clothes had gunshot residue on them. Ross moved for a directed verdict, and it was denied.

Ross testified that during his interview, he felt threatened by investigators. He explained that he shot Johnson in self-defense, explaining that he saw TJ and Johnson get into a fight, and he went to investigate. Johnson pulled a knife on TJ and then threw it at him. Ross recounted that he chased Johnson, and when Johnson reached into his jacket, he shot Johnson in self-defense. Ross explained that he was afraid of Johnson and the police, so he left the scene. Ross wrote a letter of apology to Johnson's mother, and it was admitted into evidence. In the letter, Ross confessed to shooting Johnson, explaining that he feared for his life.

Before the case was submitted to the jury for deliberation, Ross requested four jury instructions—manslaughter, use of deadly force, right to possess a handgun, and justification—which were all denied. Ross proffered the instructions. He renewed his directed-verdict motion, and it was denied.

The jury found Ross guilty of first-degree murder. The jury recommended a sentence of thirty years' imprisonment with a five-year enhancement for committing the felony with a firearm and six years for committing the felony in the presence of a child, for an aggregate sentence of forty-one years' incarceration in the Arkansas Division of Correction.

Ross timely filed his notice of appeal, and this appeal followed.

II. *Discussion*

A. Motion to Suppress

For his first point on appeal, Ross asserts that the circuit court erred in denying his motion to suppress statements he made during the two police interviews, arguing that the statements were involuntary because (1) he was threatened with life in prison and the death penalty, (2) Detective Anderson made false promises of leniency, and (3) he clearly lacked experience with the justice system at the time of the interviews. We disagree and affirm.

Ross's argument regarding the promise of leniency is not preserved for appeal. When an appellant has raised multiple arguments in his motion to suppress, we will refuse to reach the merits of those arguments that were not specifically ruled on by the circuit court in denying the motion. *See Lewis v. State*, 2017 Ark. 211, at 15, 521 S.W.3d 466, 476; *Eastin v. State*, 370 Ark. 10, 257 S.W.3d 58 (2007). Ross did not raise the issue of offers of leniency below; thus, it is not preserved for appeal.

Turning to Ross's remaining arguments regarding his motion to suppress, we find no error in the court's decision to deny the motion and affirm.

A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. *Flanagan v. State*, 368 Ark. 143, 155, 243 S.W.3d 866, 875 (2006). In cases involving a ruling on the voluntariness of a confession, this court makes an independent determination based on the totality of the circumstances. *Boyd v. State*, 2016 Ark. App. 407, at 10–11, 500 S.W.3d 772, 779. The totality of the circumstances may include the age, education, and intelligence of the accused;

7

the lack of advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; the use of mental or physical punishment; and statements made by the interrogating officers and the vulnerability of the defendant. *Id.* We review the circuit court's findings of fact for clear error, and the ultimate question of whether the confession was voluntary is subject to an independent, or de novo, determination by this court. *Id.* Any conflicts in testimony are for the circuit court to resolve because it is in a superior position to determine the credibility of the witnesses. *Id.* We look to see if the confession was the product of free and deliberate choice rather than coercion, intimidation, or deception. *Id.* For a defendant's statement to be the involuntary product of coercion, there must be an essential link between coercive activity of the State and a resulting confession by a defendant. U.S. Const. amend. V. The proper inquiry is whether defendant's will has been overborne or his capacity for self-determination critically impaired. *Id.*

Here, the circuit court did not err in finding that Ross's statement was not coerced. The videos of Ross's interviews show that before both interviews, the detectives informed Ross of his *Miranda* rights, and he stated several times that he understood his rights and did not want to have a lawyer present. Ross initiated the second interview, and both interviews lasted less than an hour. During the first and second interview, detectives told Ross that he could be sentenced to life in prison and the death penalty, respectively; however, our court has held that informing a defendant of the penalty for a murder charge is not considered coercion. *Lanes v. State*, 53 Ark. App. 266, 922 S.W.2d 266 (1996). Regarding Anderson's

harsh tone and loud voice, the court found that it was not Anderson's harsh words but the overwhelming evidence presented to Ross that led to his confession.

The instant case is distinguishable from caselaw in which we have held that the confession was coerced. In *Osburn v. State*, 2009 Ark. 390, 326 S.W.3d 771, our supreme court held that Osburn's confessions to police while in custody were the result of coercion because officers continually referenced Osburn's concern for his family, a tactic the interviewers used to keep Osburn talking. When Osburn informed the officers that he was tired, they told him they could not help him if he stopped talking. Officers also repeatedly suggested that Osburn might never see his family again and that his daughter might be arrested if he did not confess. Our court held that Osburn's will was overborne by the police interrogation. The facts in *Osburn* are vastly different from the facts in the instant case, and the circuit court correctly found that Ross's will was not overborne by the detectives' harsh tone during questioning.

Additionally, Ross argues that he did not understand the events around his arrest and interviews and refers to the following comment he made to the police:

> I thought y'all was going to say something about that the first time when I went to my bond hearing, I thought y'all was going to go on and sentence me, bro, after I said that. That's why I like why haven't they sentenced me yet. That's why I feel like I could come in here and lie. That's what I feel like. Is they fixing to send me a lawyer. Ask them to give me the death penalty.

Ross contends that this comment shows his inexperience with the justice system and that he clearly did not understand what was happening to him. We do not agree. Ross was adequately informed of his *Miranda* rights, he understood them, and his statements were

voluntary and not coerced, as discussed above. Moreover, Ross requested the second interview with the detectives, demonstrating his understanding of the legal process and willingness to participate. The circuit court's decision to deny the motion to suppress was not clearly in error, and we affirm.

## B. Manslaughter and Justification Jury Instructions

On appeal, Ross argues that this is a case of first impression because it involves the interpretation of new jury instructions regarding the Stand Your Ground Law adopted by the Arkansas legislature, Act 250 of 2021, § 1, codified at Ark. Code Ann. § 5-2-607 (Supp. 2023). He asserts that no model instruction existed when this case was tried; thus, the jury should have been instructed on manslaughter and justification because there was evidence demonstrating that Ross reasonably feared for his safety at the time of the shooting. His argument is not well taken.

There must be a rational basis in the evidence to warrant the giving of a jury instruction. *Bridges v. State*, 2023 Ark. 157, at 7, 676 S.W.3d 275, 279. When the defendant has offered sufficient evidence to raise a question of fact concerning a defense, the instructions must fully and fairly declare the law applicable to that defense; however, there is no error in refusing to give a jury instruction when there is no basis in the evidence to support the giving of the instruction. *Id.*, 676 S.W.3d at 279. Our appellate courts have affirmed a circuit court's refusal to submit a proffered jury instruction when the only basis for the instruction was the defendant's self-serving statements or testimony, contradicted by other witnesses. *Id.*, 676 S.W.3d at 279. We will not reverse the circuit court's refusal to

10

submit an instruction to the jury absent an abuse of discretion. *Id.* An abuse of discretion is a high threshold that does not simply require error in the circuit court's decision but requires that the circuit court act improvidently, thoughtlessly, or without due consideration. *Collins v. State*, 2019 Ark. 110, at 5, 571 S.W.3d 469, 472.

Arkansas Code Annotated § 5-2-607 provides:

(a) A person is justified in using deadly physical force upon another person if the person reasonably believes that the other person is:

(1) Committing or about to commit a felony involving physical force or violence;

(2) Using or about to use unlawful deadly physical force.

A reasonable belief is the belief that an ordinary and prudent person would form under the circumstances, not one that is recklessly or negligently formed. Ark. Code Ann. § 5-1-102 (Repl. 2013). A person commits manslaughter if he recklessly causes the death of another person. Ark. Code Ann. § 5-10-104(a)(3) (Repl. 2013).

Ross argues that the circuit court abused its discretion in denying his request for jury instructions on manslaughter and justification. He argues that the evidence was sufficient to raise a question of fact concerning the instructions. To support his argument Ross cites *Harshaw v. State*, 344 Ark. 129, 39 S.W.3d 753 (2001), in which our supreme court reversed the circuit court's decision denying the request for a manslaughter instruction, holding that Harshaw was entitled to a manslaughter instruction as a lesser-included offense to second-degree murder because he acted on the basis of an unreasonable or recklessly formed belief that he needed to use deadly force to protect himself. Testimony at the trial showed that

Harshaw, who was in an argument with the victim at the time of the shooting, believed that he was being threatened with violence when the victim talked about using a gun. Eyewitnesses corroborated that the victim made several statements insinuating that if there was a problem, he would settle it with a gun:

> I. "Oh, that's all right. I'll just go get my gun and shoot it up."
>
> II. "It'll be some pistol play out here."
>
> III. "I'll get my nine and shoot this MF up."
>
> IV. "If there was a problem, I'd have a gun."
>
> V. "Well, you know, if it was a problem, I'd have my gun and I'd shoot—be shooting it up out here, you know."
>
> VI. "K-3 [Casey Cunningham] ain't no punk. If I got a problem, I just boom boom boom like that."

*Harshaw*, 344 Ark. at 131, 39 S.W.3d at 755.

There was testimony that Harshaw thought the victim was reaching for a weapon in his car, even though the victim was unarmed when he was shot. The instant case is distinguishable. Unlike *Harshaw*, there were no eyewitnesses that corroborated Ross's statements that he felt he was in danger. In denying Ross's request, the court noted that Ross chased Johnson, and it disagreed that the video showed Johnson appearing to reach into his jacket.

The instant case is more akin to *Morris v. State*, 351 Ark. 426, 94 S.W.3d 913 (2003), in which our supreme court affirmed the circuit court's decision that Morris, who was charged with first-degree murder, was not entitled to an instruction on the lesser-included

12

offense of manslaughter. In reviewing whether slight evidence or a rational basis existed for giving the manslaughter instruction, the court considered the evidence that Morris "could conceivably" have relied on for forming a belief that he needed to defend himself with deadly force. 351 Ark. at 432, 94 S.W.3d at 917. Our supreme court listed the evidence as follows:

I. In an earlier incident in a nightclub parking lot, the Sharp car almost hit Morris.

II. Occupants in the Sharp car and Morris's car began arguing after that.

III. Later in the evening while Morris's car and Sharp's car were side-by-side at a stop light, an occupant in the victim's car either started to roll down his window or had partially done so already. Morris thought he saw a gun, panicked, and shot Chris Sharp.

IV. Only one person, Daniel Fells, other than Morris testified that threats came from Sharp's car, but Fells admitted on cross-examination that he probably had told the police officers following the shooting that no threats were made.

*Id.*

Ross's statement that he thought Johnson was reaching into his jacket for a gun is very similar to Morris's statement that he thought he saw a gun in Sharp's vehicle. Here, as in *Morris*, the circuit court correctly concluded that a previous incident of conflict between the shooter and the victim did not merit a manslaughter instruction. Accordingly, the circuit court did not abuse its discretion in deciding there was neither slight evidence that Ross reasonably believed Johnson was using or about to use unlawful deadly physical force nor evidence that he reasonably believed his life was in imminent danger. We affirm the circuit court's decision that no rational basis existed for giving the proffered instructions.

C. Toxicology Report

13

Ross contends that the circuit court erred by not admitting Johnson's toxicology report showing that he tested positive for alcohol and marijuana at the time of his death. Ross argues that the toxicology report is relevant to his manslaughter defense because the drugs in Johnson's system could have influenced his actions on the night of the shooting. We disagree and affirm.

Evidence of a victim's intoxication or drug use at the time of death is generally irrelevant to the defendant's claim of justification. *Walton v. State*, 2023 Ark. App. 409, 677 S.W.3d 216. The evidence may be relevant only if the defendant knew the victim was using drugs or alcohol or if the victim's behavior was such that the defendant could have reasonably inferred that the victim was under the influence. *Id.* Our supreme court has held that when there is no "quantification" of the drugs in the victim's system the appellant failed to establish that the victim was under the influence at the time of the shooting. *See Drennan v. State*, 2018 Ark. 328, at 12–13, 559 S.W.3d 262, 268–69; *Jones v. State*, 340 Ark. 390, 396–97, 10 S.W.3d 449, 453 (2000) ("Because the defense was unable to show that the cocaine use prompted the killing, the trial court did not err in ruling that the probative value of the evidence was far outweighed by its prejudicial nature.").

In the instant case, there was no evidence that Ross knew or could have reasonably believed Johnson was intoxicated. Additionally, the toxicology report was not quantitative, and Johnson's behavior as shown on the video did not suggest that he was under the influence of a substance. Accordingly, we affirm.

Affirmed.

ABRAMSON and BARRETT, JJ., agree.

*Dowden, Worley, Jewell & Olswing, PLLC*, by: *J. Conner Ray*; and *Stroud, Flechas & Dalton*, by: *Matthew G. Dalton*, *pro hac vice*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Kent G. Holt* and *A. Evangeline Bacon*, Ass't Att'ys Gen., for appellee.