Cite as 2025 Ark. App. 467

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CR-23-800

| | |
|---|---|
| BRADLEY UREN<br><br>APPELLANT<br><br>V.<br><br><br>STATE OF ARKANSAS<br><br>APPELLEE | Opinion Delivered October 8, 2025<br><br>APPEAL FROM THE BAXTER COUNTY CIRCUIT COURT [NO. 03CR-20-97]<br><br>HONORABLE GORDON WEBB, JUDGE<br><br>AFFIRMED |

## N. MARK KLAPPENBACH, Chief Judge

Bradley Uren appeals his convictions for three counts of rape. Appellant contends that there is insufficient evidence to support each conviction and that the circuit court erred in denying his motion to suppress an out-of-court statement. We affirm.

Although Uren argues the sufficiency of the evidence as his second point on appeal, we address sufficiency first. *See Merrill v. State*, 2024 Ark. App. 575, 702 S.W.3d 420. We will affirm if there is substantial evidence, either direct or circumstantial, to support the verdict. *Harvey v. State*, 2024 Ark. App. 576, 700 S.W.3d 904. Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion and conjecture. *Id.* The evidence is viewed in the light most favorable to the verdict, and only evidence supporting the verdict is considered. *Id.* Credibility of witnesses is an issue for the jury and not this court. *Fowler v. State*, 2024 Ark. App. 63, 684 S.W.3d 271. We consider

all the evidence whether admitted properly or erroneously. *Burciaga v. State*, 2024 Ark. App. 341, 690 S.W.3d 456. The jury is responsible for weighing the evidence and assessing the credibility of witnesses. *Fowler, supra.* The jury may believe all or part of any witness's testimony and is responsible for resolving questions of conflicting testimony and inconsistent evidence. *Id.* A jury is entitled to draw upon common sense and experience in reaching its verdict. *Roberts v. State*, 2024 Ark. App. 143, 686 S.W.3d 69.

Two of the rape charges related to his ten-year-old daughter (MC1), and one rape charge related to his thirteen-year-old daughter (MC2). The State was required to prove that Uren engaged in sexual intercourse or deviate sexual activity with each girl.

Sexual intercourse is defined as "penetration, however slight, of the labia majora by a penis." Ark. Code Ann. § 5-14-101(13) (Repl. 2024). As relevant here, deviate sexual activity includes any act of sexual gratification involving the penetration, however slight, of the labia majora of a person by any body member of another person. Ark. Code Ann. § 5-14-101(1). Penetration can be shown by circumstantial evidence. *Hartley v. State*, 2022 Ark. 197, 654 S.W.3d 802. If the evidence "gives rise to more than a mere suspicion, and the inference that might reasonably have been deduced from it would leave little room for doubt, that is sufficient." *Id.* at 5, 654 S.W.3d at 806.

MC1 testified[1] that, when no one else was around, Uren would force her to take off her clothes or he would take her clothes off. Her father would "stick" his fingers "up [her]"

---

[1]MC1 was ten years old when she reported the abuse. She was fourteen at the time of trial.

inside her "lady parts." He would do the same with his penis. She said that this happened about twice a month before she reported being sexually abused. MC1 was afraid of Uren. He told her that if she told anyone, he would hurt all her friends, her family, and everyone she knew. MC2 testified[2] that on six or seven occasions, also when no one else was around, her father directed her to take off her clothes, and he would "put his penis in my vagina." MC2 said "he was moving," so she knew he was having sex with her.

The girls' mother, Jennifer, said that one time she walked into the laundry room to find MC1 sitting on Uren's lap; Uren had one arm wrapped around MC1's waist and his other hand was in between MC1's legs; he was using his thumb to rub the child's vagina on the outside of her clothing. When she confronted Uren about the allegations, Uren warned Jennifer to keep her "damn mouth shut." Uren had called MC1 "a lying little b*tch" and MC2 "a four-eyed c*nt." Jennifer was afraid of Uren because he had been violent with her. During an interview conducted after he was arrested, Uren became emotional, began crying, and admitted that he had "touched" his daughters. The jury found Uren guilty on all three counts. Uren was sentenced to three consecutive forty-year terms of imprisonment (a total of 120 years). This appeal followed.

Uren argues that MC1 initially told her mother that he had "touched" her, and initially MC2 denied any sexual abuse occurred. He contends their stories were inconsistent

---

[2]MC2's testimony established that she was thirteen years old, or younger, when the alleged abuse happened. She was sixteen at the time of trial.

and evolved to include rape. He also argues that MC1's testimony (that he stuck his fingers in her lady parts) was too vague, failed to meet the statutory definition of penetration, and left the jury to speculate.

The jury obviously believed the girls' damaging testimony. *Fowler, supra.* The jury is empowered to resolve any inconsistencies in the evidence. *Id.* We consider only the evidence that supports the jury verdict and view the evidence in the light most favorable to the State. *Harvey, supra.* Furthermore, in *Roberts v. State*, 2024 Ark. App. 143, 686 S.W.3d 69, we rejected the argument on appeal of a sexual-assault conviction that the words "dry humping" and "grinding" left the jury to speculate what the teenage female victim meant the accused did to her and where the alleged contact was made. We held that the jury was allowed to use its common sense in deciding whether sexual contact occurred. Given the allegations and the evidence in this case, the jury could use its common sense to determine what MC1 was saying. The evidence presented to the jury was sufficient to support each rape conviction.

Uren's other argument on appeal is that the circuit court clearly erred when it denied his motion to suppress his pretrial statement to police during which he became emotional and admitted that he had touched his daughters. Uren specifically asserts that his statement on March 9, 2020, was involuntary because (1) he had deficient intellectual functioning, (2) the officer failed to repeat the *Miranda* warnings to him, (3) the questioning was unduly long and unfairly repeated, (4) the officer used deceptive and coercive tactics, and (5) the officer made false promises of leniency. We disagree with Uren and hold that the circuit court did not clearly err.

4

The circuit court denied the motion to suppress in a detailed letter opinion.  In sum, the circuit court found that Uren was not subjected to force, intimidation, or threats; was not "anywhere close to be being disabled intellectually"; "had a long history of normal adult behavior"; had not been professionally evaluated until a mental examination long after his arrest; and "was fully capable" of refraining from incriminating himself as demonstrated in the videos of the interviews.  The circuit court found that the March 9 interview was one continuous interview that had a break in the middle, so the officer was not required to give Uren *Miranda* warnings a second time.  The circuit found that the officer's tactics were "free from any improper deception."

When we review a circuit court's denial of a motion to suppress, we make an independent, de novo determination based on the totality of the circumstances.  *Nelson v. State*, 2025 Ark. 22, 705 S.W.3d 876.  We will reverse the circuit court's ruling only if it is clearly against the preponderance of the evidence.  *Id.*  A statement while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made.  *Ross v. State*, 2025 Ark. App. 204, 711 S.W.3d 814.  The circumstances considered may include the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; the use of mental or physical punishment; statements made by the interrogating officers; and the vulnerability of the defendant.  *Id.*  Any conflicts in testimony are for the circuit court to resolve because it is in a superior position to determine the

5

credibility of the witnesses. *Id.* We determine whether the confession was the product of free and deliberate choice rather than coercion, intimidation, or deception. *Id.* To conclude that a statement is the involuntary product of coercion, there must be an essential link between the State's coercive activity and a resulting confession. *Id.* The proper inquiry is whether the defendant's will was overborne or his capacity for self-determination was critically impaired. *Id.*

Uren was interviewed on January 3 and March 9, 2020. There were video recordings of these interviews. On the afternoon of January 3, Uren spoke to two different officers. This was shortly after MC1's sexual-abuse report and before MC2 reported sexual abuse. The officers gave Uren *Miranda* warnings. He voluntarily answered questions, consensually submitted DNA, and agreed to take a voice stress test. Uren consistently and adamantly refused to admit any wrongdoing and left after the inquiries ended. The process lasted around two hours.

Uren was arrested on March 6 and was in jail when he was interviewed again on March 9. Uren was a married, employed, thirty-five-year-old man. A Baxter County Sheriff's officer verbally advised Uren of his *Miranda* rights at 2:04 p.m. Uren wrote his initials beside each of his rights and signed the form explaining his rights. The two officers involved at the beginning of the interview (one of whom had earlier administered the voice stress test) did not perceive any intellectual disability or failure on Uren's part to understand what was happening or what was said. Both officers remained seated across the table from Uren during their interview. Uren was adamant that he did not do anything wrong to his

6

daughters, maintaining that stance throughout the first half hour, after which the two officers left the room. Uren remained seated at the table.

About thirteen minutes later, Sergeant Scott Thrasher entered the room and sat down across the table from Uren. Thrasher did not restate the *Miranda* warnings. He said he had been watching the two other officers do the interview, that this was not his case, and that he was an evidence custodian. Thrasher took a "good cop" role and was calm and respectful.

Thrasher told Uren that something had been deleted from Uren's cell phone and that Uren should take "a baby step and admit that there's something in the deleted file." Uren agreed he looked at pornography and might have had pictures of himself but not the children. Thrasher told Uren that father-daughter-themed pornography had been found on his cell phone (which was not true). Uren responded, "Is there?" Thrasher said the theme "points to something. . . .That's all I'm telling you." Uren continued to deny that he raped his daughters. Thrasher told Uren he had failed the voice stress test and that no healing could take place without saying exactly what he did to his daughters. Thrasher's approach was more personal and less forceful than that of the first two officers. Thrasher repeatedly urged Uren to admit what really happened and to tell the truth, appealing to Uren's love for his children.

Thrasher told Uren that he was in a lot of trouble, that he "did something," and that he should "get in front of it." He said he felt Uren was burdened by guilt and the heaviness in his heart, and he would take whatever Uren revealed to the prosecutor. Thrasher did not agree to make any "deals" but said the prosecutor believed Uren had raped his daughters so

7

he (Thrasher) wanted to be able to go to the prosecutor to say "no, it wasn't [rape] . . . we found out it was this." He urged Uren to "say it happened" and "tell him about it."

Uren insisted that he could not go to jail, that he had a dying father to take care of, and that he needed to keep working and take care of his family. Uren asked about probation or some kind of deal. After about thirty minutes into Thrasher's interview, Uren became a bit tearful and admitted that he had not been forthcoming about some things but insisted he did not penetrate his daughters. Thrasher brought Uren something to drink. About forty-five minutes into the interview, after multiple silences during which Uren put his head in his hands and did not speak, Uren admitted that he had touched his daughters. Uren never admitted to conduct constituting rape.

Uren argues that he is intellectually disabled, making him vulnerable to interrogation tactics. Uren did not finish high school and has a full-scale IQ score of 69, which is within the upper mildly deficient range. But Uren had been married for seventeen years, he had a driver's license and a vehicle, he managed his own money and paid household bills, he took care of his daily affairs, and he was able to run a successful lawn-care and handyman business. Uren admittedly had problems with drinking and getting into fights. Uren did not display any behaviors or speech that would prompt one to conclude that he did not understand. He expressed stress and frustration about being in jail and being accused of raping his children. Uren had been convicted of sexual assault when he was a teenager, so he was not a stranger to the justice system.

We have conducted a de novo review and conclude that Uren fails to demonstrate reversible error. There is no constitutional requirement that a suspect be warned of his or her *Miranda* rights each time the suspect is questioned. *Williams v. State*, 363 Ark. 395, 214 S.W.3d 829 (2005). There is likewise no mechanical formula for measuring the longest permissible interval between the last warning and the confession. *Id.* *Miranda* warnings need only be repeated when the circumstances have changed so seriously that the accused's answers are no longer voluntary, or the accused is no longer making a knowing and intelligent relinquishment or abandonment of his or her rights. *Pitts v. State*, 2019 Ark. App. 107, 571 S.W.3d 64. Here, Uren was advised of his rights twice in January 2020, and he was so advised once in March 2020. On this record, the circuit court did not clearly err in rejecting Uren's argument that he should have been advised of his rights again by Sergeant Thrasher.

We next consider Uren's allegation that he was given false promises to induce an incriminating admission and that he was susceptible to falling for such promises. We have a two-stage inquiry. First, we look at the nature of the officer's statement. *Montgomery v. State*, 2022 Ark. App. 329, 653 S.W.3d 21. If the officer made an unambiguous false promise of leniency, then the statement elicited from the defendant is automatically inadmissible; if the officer made no promises of leniency, the statement is admissible. *Id.* If the officer's statements are ambiguous, we proceed to the second step of the analysis to examine the defendant's vulnerability along several dimensions: age, education, intelligence, length of interrogation, experience with the justice system, and the delay between the defendant

9

receiving *Miranda* warnings and the statement. *Id.* The object of the rule is not to exclude a confession of truth but to avoid the possibility of a confession of guilt from one who is, in fact, innocent. *Id.*

We hold that the circuit court did not clearly err. Thrasher told Uren that he could not make any "deals." Thrasher's demeanor was calm and respectful throughout his time with Uren, which lasted less than one hour. As to Thrasher's false statement that there was father-daughter-themed pornography on Uren's cell phone, Uren expressed surprise, and the interview proceeded from there. Our supreme court has found no fault with an interrogator trying to persuade an accused to tell the truth, even though the interrogator may have made misrepresentations of fact, so long as the means employed are not calculated to procure an untrue statement, and the confession is otherwise voluntarily made. *See Nelson v. State*, 2025 Ark. 22, 705 S.W.3d 876; *Friar v. State*, 2016 Ark. 245.

Even if we were to agree that Thrasher made an ambiguous promise of leniency, the circuit court did not clearly err in denying the motion. The main thrust of Uren's argument is that his intellectual level rendered him so vulnerable to tricky interview tactics that his incriminating statement must be excluded from the evidence. Uren contends that Thrasher essentially forced Uren to agree that he improperly touched his daughters. We disagree.

Uren was well into adulthood, living a typical adult life and working. On January 3, he was twice informed of his *Miranda* rights. On March 9, he was given oral and written *Miranda* warnings less than an hour before he spoke with Thrasher. He was not a stranger to the justice system. He was able to converse with Thrasher, who maintained a calm demeanor

10

and brought Uren a drink during the interview. Uren was tearful when he agreed he had "touched" his daughters but flatly denied ever doing anything that would constitute penetration. On the totality of these circumstances, Uren has failed to demonstrate reversible error in the denial of his motion to suppress.

Affirmed.

VIRDEN and WOOD, JJ., agree.

*Lisa-Marie Norris*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Rebecca Kane*, Ass't Att'y Gen., for appellee.