Cite as 2025 Ark. App. 501

# ARKANSAS COURT OF APPEALS

DIVISION II

No. CR-24-655

| | |
|---|---|
| SHADRACK WARD | **Opinion Delivered** October 22, 2025 |
| APPELLANT | APPEAL FROM THE CRAIGHEAD COUNTY CIRCUIT COURT, WESTERN DISTRICT |
| V. | [NO. 16JCR-22-419] |
| STATE OF ARKANSAS | HONORABLE SCOTT A. ELLINGTON, JUDGE |
| APPELLEE | |
| | AFFIRMED |

## WAYMOND M. BROWN, Judge

A Craighead County Circuit Court jury convicted appellant Shadrack Ward of the first-degree murder of his fiancée, Sabrina Benson. Ward was sentenced as a habitual offender to serve a seventy-year term of incarceration in the Arkansas Division of Correction. On appeal, Ward (1) challenges the admissibility of his custodial statements; (2) argues that there was insufficient evidence to support the conviction; and (3) contends he was entitled to a manslaughter jury instruction. We find no error and affirm Ward's conviction.

On November 21, 2021, Ward called 911 requesting medical help for Benson. In response, an ambulance, firefighters, and law enforcement officers were dispatched to the address. On arrival, Benson was found unresponsive and lying in the hallway of the home she shared with Ward. She was moved to the living room floor, and CPR was administered. Benson was then transported to the hospital where she was pronounced deceased. At the scene, Ward told officers that he and Benson

had been drinking with friends that evening. When he got up to go to bed, he found Benson unconscious in the hallway. An autopsy determined Benson's cause of death to be strangulation and head injuries at the hands of another—homicide.

On February 21, 2022, after evidence revealed that Benson died by strangulation, Ward was transported to the Jonesboro Police Department for an interview.[1] During the interview, Ward initially repeated what he told officers on the night of Benson's death: he found her unresponsive in the hallway after a night of drinking with friends. Ward's story changed once he was informed that the medical examiner's report did not match his recount of events. Ward stated that he and Benson got into an argument about Ward's wanting to go out drinking with friends. He told Detective Bill Brown that, during the argument, he threw Benson against a door and grabbed her neck with his hands. Ward stated that when he let her go, Benson fell straight to the floor. Ward then called 911. On March 7, Ward was charged by information with first-degree murder with a habitual-offender enhancement.

On February 12, 2024, a hearing was held on pretrial motions, which was primarily a suppression hearing on the voluntariness of Ward's statement to Detective Brown during the custodial interrogation.

Detective Brown testified that following the medical examiner's determination that Benson's cause of death was homicide by strangulation, he interviewed Ward. Detective Brown stated that before the interview, he read Ward his statement of rights and that Ward appeared to understand it and signed the bottom of the document. Detective Brown testified that he did not threaten, coerce,

---

[1]Ward was being held at Craighead County Detention Center (CCDC) on unrelated charges.

or force Ward to give a statement. Ward was not handcuffed or otherwise restrained. Detective Brown was not carrying his weapon during the interview. A video recording of the interview was admitted into evidence and played in court. Following the testimony, the statement-of-rights portion of the video recording was played again. The court ruled that Ward validly waived his rights, and his statement was voluntarily given.

The three-day jury trial began the next day. The testimony pertinent to this appeal is highlighted herein.

Deputy Coroner Arizona Sharp testified that he was called to NEA Baptist Hospital in response to Benson's death. He examined her body and found no external injuries or red flags that would suggest foul play. He then went to the family waiting room and asked to speak with Benson's boyfriend or fiancé and was told that he was not there. Ten to fifteen minutes later, Deputy Coroner Sharp again attempted to speak with Benson's boyfriend or fiancé and was asked, "Why does it matter? Who are you with anyways?" Eventually, he was able to speak to Benson's son and daughter, and her body was sent to the crime lab.

Detective Brown testified much the same as he did during the pretrial suppression hearing. Detective Brown stated that at the outset of his interview of Ward, he read him his rights, he verbally confirmed that Ward understood his rights, and Ward signed the waiver affirming that he wanted to make a statement and answer questions. A video of the interview was played in court.

In the video, Ward initially stated that after friends left their home following a night of drinking and smoking marijuana, Benson went to get ready for bed while he continued drinking.

When he got up to turn the music and "everything" off, he saw Benson lying in the hallway.[2] He thought she was "playing"; however, when he could not get a response from her, he panicked and called 911.

As the interview progressed and the medical-examination report was referenced, Ward changed his story. He told Detective Brown that on the night of Benson's death, he was "pretty blasted." He and Benson got into an argument, and she charged at him because she wanted him to stay home and drink instead of going out with friends. Ward stated that he then grabbed her "around her neck" with both hands and told her to stop. Ward agreed that he held her "too long." When he released her, Benson "fell straight down." Ward further stated, "[W]hen I was trying to get her off me, I threw her to the door."

Dr. Stephen Erickson, deputy chief medical examiner with the Arkansas State Crime Laboratory, testified that on November 23, 2021, he conducted Benson's autopsy. He was informed that she had been drinking and had collapsed, and medics attempted to resuscitate her; however, she was declared dead at the hospital. He stated that there were no external signs of trauma. Dr. Erickson noticed that Benson had petechial hemorrhages on her eyelids and extensive hemorrhage in her eyes. Her internal examination displayed the "constellation of strangulation," such as streak hemorrhages in her neck muscles and hemorrhaging in her esophagus and throat. The hemorrhages indicate a significant pressure on her neck. Benson also had major contusions on her scalp indicating significant trauma consistent with something hitting her head very hard. Benson's toxicology report revealed that there were no drugs or alcohol in her system at the time of her death. Dr. Erickson

---

[2]Ward later recounted that he got up in response to Benson calling his name, and that is when he found her unresponsive in the hallway.

determined within a reasonable degree of medical certainty that Benson's death was the result of strangulation and head injuries by the hands of another.

After the State rested, the defense moved to renew the motion to suppress Ward's custodial statement. The circuit court again denied the motion, ruling that Ward was appropriately advised of his rights, and he waived those rights voluntarily and without coercion. The defense then moved for a directed verdict, arguing that the State failed to prove Ward had the purpose, intent, or motive to cause Benson's death. The circuit court denied the directed-verdict motion.

Along with jury instructions for first-degree murder and the lesser included offense of second-degree murder, Ward requested an instruction for manslaughter. The State objected. The court denied the request, ruling that the evidence and testimony exceeded the proof required for a manslaughter argument. The defense rested and renewed its directed-verdict motion, which the circuit court again denied.

The jury found Ward guilty of the first-degree murder of Benson. He was sentenced as a habitual offender to a seventy-year term of incarceration. Ward appealed.

Ward argues in his first point on appeal that the circuit court erred by failing to suppress the statements he gave during the custodial interrogation. However, because Ward also argues that the circuit court erred by denying his motions for directed verdict, double-jeopardy concerns require us to first address the sufficiency challenges.[3] Preservation of an appellant's right to freedom from double jeopardy requires a review of the sufficiency of the evidence before a review of trial errors.[4]

---

[3] *Taffner v. State*, 2018 Ark. 99, 541 S.W.3d 430.

[4] *Harris v. State*, 284 Ark. 247, 681 S.W.2d 334 (1984) (discussing *Burks v. United States*, 437 U.S. 1 (1978)).

It is well settled that we treat a motion for a directed verdict as a challenge to the sufficiency of the evidence.[5] Evidence is sufficient if it is substantial.[6] Substantial evidence is evidence of sufficient force and character that it will compel a conclusion without resort to speculation or conjecture.[7] On review, the evidence is viewed in the light most favorable to the verdict, and only evidence supporting the verdict will be considered.[8] The appellate court does not weigh the evidence presented at trial or assess the credibility of the witnesses because those are matters for the fact-finder.[9] The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence.[10]

A person commits first-degree murder if he or she, with the purpose of causing the death of another person, causes the death of another person.[11] A person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result.[12] The purpose to commit a crime can be formed in an

---

[5]*Farris v. State*, 2021 Ark. App. 191, 620 S.W.3d 559.

[6]*Id.*

[7]*Id.*

[8]*Id.*

[9]*Dortch v. State*, 2018 Ark. 135, 544 S.W.3d 518.

[10]*Id.*

[11]Ark. Code Ann. § 5-10-102(a)(2) (Supp. 2021).

[12]Ark. Code Ann. § 5-2-202(1) (Repl. 2013).

instant.[13]  Because intent is seldom capable of proof by direct evidence, it usually must be inferred from the circumstances surrounding the killing.[14]  The intent necessary for first-degree murder may be inferred from the victim's wounds.[15]

Ward does not suggest that anyone other than himself caused the injuries that resulted in Benson's death.  Instead, Ward contends that the circuit court erred in denying his motion for directed verdict because the State failed to prove beyond a reasonable doubt that he had the intent or motive to cause Benson's death.[16]  He argues that "his actions were as a result of intoxication, and he merely shoved her back when she charged at him."  Ward asserts that his acts "indicate rough-housing, but no purpose or intent to cause the death of a person."

Dr. Erickson testified that, within reasonable medical certainty, the cause of Benson's death was homicide as a result of strangulation and extensive head injuries.  He stated that Benson's head displayed "significant scalp hemorrhages" and major contusions on the left, right, back, and front that indicated repetitive, significant head trauma and force that could cause a loss of consciousness.  Dr. Erickson saw what he referred to as the "constellation of strangulation."  He testified that from the external-examination portion of the autopsy, Benson's eyes showed extensive hemorrhaging; she also had petechial hemorrhages over her eyelids and within her eyebrows.  Turning to the internal

---

[13]*Tarentino v. State*, 302 Ark. 55, 786 S.W.2d 584 (1990).

[14]*Halliburton v. State*, 2020 Ark. 101, 594 S.W.3d 856.

[15]*Id.*

[16]The relevant statute required the State to prove that Ward acted purposely; there is no statutory requirement to prove motive for first-degree murder. *See Parker v. State*, 290 Ark. 158, 717 S.W.2d 800 (1986).

examination, Dr. Erickson noted that Benson's striated muscles—sternocleidomastoid, sternohyoid, thyrohyoid, and omohyoid—all had streak hemorrhages in them, indicating "a significant pressure on the neck." Hemorrhage in the deep part of Benson's esophagus was also found.

Regarding the process of strangulation, Dr. Erickson testified that it takes approximately fifteen seconds of obstruction before a person is rendered unconscious "as far as the frontal part of the brain." If the person is released at that point, oxygen and glucose will quickly return to the brain, and the person will wake up. However, if the jugular veins are held long enough, the deep primitive part of the brain that runs the respiratory drive will shut off. It takes "many seconds to a minute" of continuous jugular pressure for this to occur. Brain death begins after approximately four minutes of oxygen deprivation.

First, voluntary intoxication does not negate criminal intent.[17] Second, considering the facts and testimony of Dr. Erickson, there is substantial evidence that Ward purposely caused Benson's death. Her head had multiple contusions and extensive bruising from repetitive forceful strikes, strong enough to cause her to lose consciousness. Ward admitted that he grabbed her by her neck and strangled her. The evidence demonstrates that he did so for an extended period of time, sufficient to shut off her body's respiratory drive, resulting in her death. This is sufficient to establish that Ward acted with the purpose of causing the death of another person as required for first-degree murder. Therefore, we cannot say that the circuit court erred in denying Ward's directed-verdict motion.

---

[17]*See* Ark. Code Ann. § 5-2-207 (Repl. 2013); *Collins v. State*, 2021 Ark. 35, 617 S.W.3d 701.

8

Ward next argues that the circuit court erred in denying his motion to suppress the statement he made during his police interview, arguing that the statement was involuntary because it was the "result of deception on the part of the detective." Ward asserts that the confession was induced by the detective's claims of understanding and possession of the medical examiner's report. He contends that the detective "created an atmosphere that indicated speaking to him would be of assistance."

Importantly, Ward's argument at the suppression hearing was that his custodial statement was not voluntary because the statement of rights was read to him, and there was no acknowledgement other than his signature at the end. Suppression arguments that were not presented to the circuit court cannot be raised on appeal.[18] Consequently, Ward's claim regarding the voluntariness of his confession brought about by ambiguous statements, deception, and false claims of understanding is not preserved for review.

Ward also contends on appeal that his custodial statement was involuntary because he was not permitted to read the statement of rights for himself; instead, it was read to him, and he was not allowed to write on the form except for his signature. He asserts that Detective Brown did not specifically ensure that Ward understood his rights.

A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made.[19] In cases involving a ruling on the voluntariness of a confession, this court makes an independent determination based on the totality of the

---

[18]*See Villanueva v. State*, 2013 Ark. 70, 426 S.W.3d 399.

[19]*Flanagan v. State*, 368 Ark. 143, 243 S.W.3d 866 (2006).

circumstances.[20] We review the circuit court's findings of fact for clear error, and the ultimate question of whether the confession was voluntary is subject to an independent, or de novo, determination by this court.[21] Any conflicts in testimony are for the circuit court to resolve because it is in a superior position to determine the credibility of the witnesses.[22]

Ward makes no argument that he requested to read the rights form for himself, nor does he assert that he did not fully understand his rights when read to him by the detective. Moreover, he does not explain how being read his rights versus reading the statement-of-rights form for himself affected his understanding of the document's contents. He further fails to identify how initialing each right for himself would have altered his level of understanding. Ward has failed to fully develop an argument on this point. We will not consider points on appeal that are not supported by compelling argument.[23]

Out of an abundance of caution, we note that a written waiver is not required to effect a valid waiver.[24] Further, as is the case here, admission of a waiver form is not essential where there is no contention that the rights were not explained or understood.[25] It is undisputed that Detective Brown explained Ward's rights to him by reading the statement-of-rights form. After reading each right, as

---

[20]*Boyd v. State*, 2016 Ark. App. 407, 500 S.W.3d 772.

[21]*Id.*

[22]*Id.*

[23]*See Vaughn v. State*, 2015 Ark. App. 136, 456 S.W.3d 767.

[24]*Dondanville v. State*, 85 Ark. App. 532, 157 S.W.3d 571 (2004).

[25]*Id.*

10

evidenced by the video recording of the interview, Ward verbally acknowledged that he understood by stating "yes" or "yes, sir." He then signed the bottom of the form, verifying that he understood his rights, was willing to make a statement, and did not want a lawyer at that time. Detective Brown testified that Ward appeared to understand his rights and what was said to him. He stated that Ward did not seem to be under the influence of drugs or alcohol or otherwise incapacitated. On the basis of this record, we hold the circuit court's decision on the voluntariness of Ward's custodial statement was not clearly erroneous.

For his final point, Ward argues that the circuit court abused its discretion by denying an instruction on extreme-emotional-disturbance manslaughter. He contends that witnesses and the 911 calls "indicated the severe emotional disturbance [he] was exhibiting on the night of the incident." Ward asserts that the testimony from officers and the 911 dispatcher coupled with statements made by Ward's friends at the scene that he was behaving aggressively, causing a disturbance, and screaming for help for Benson all illustrate that he experienced an extreme emotional disturbance "the night of the incident."

A party is entitled to a jury instruction when it is a correct statement of law and when there is a rational basis to support giving the instruction.[26] A circuit court's decision whether to give an instruction will not be reversed unless the court abused its discretion.[27] An abuse of discretion is a high threshold that does not simply require error in the circuit court's decision but requires that the

---

[26]*Hatley v. State*, 2021 Ark. App. 134, 619 S.W.3d 77.

[27]*Id.*

11

circuit court act improvidently, thoughtlessly, or without due consideration.[28] Refusal to give an instruction on a lesser included offense is reversible error if the instruction is supported by even the slightest evidence.[29] The circuit court's decision to not give an instruction on a lesser included offense will be affirmed if there is no rational basis for doing so.[30]

A person commits manslaughter if the person causes the death of another person under circumstances that would be murder, except that he or she causes the death under the influence of extreme emotional disturbance for which there is reasonable excuse.[31] The reasonableness of the excuse is determined from the viewpoint of a person in the actor's situation under the circumstances as the actor believed them to be.[32] A jury instruction on extreme-emotional-disturbance manslaughter requires evidence that the defendant killed the victim following provocation such as physical fighting, a threat, or a brandished weapon.[33] Being angered, irritated, or annoyed by the victim does not constitute evidence of an extreme emotional disturbance.[34]

Here, there was no rational basis to support instructing the jury on extreme-emotional-disturbance manslaughter. There was no evidence of a physical fight, threats, or a weapon brandished

---

[28]*Collins v. State*, 2019 Ark. 110, 571 S.W.3d 469.

[29]*Dixon v. State*, 2019 Ark. 345, 581 S.W.3d 505.

[30]*Id.*

[31]Ark. Code Ann. § 5-10-104(a)(1)(A) (Repl. 2013).

[32]Ark. Code Ann. § 5-10-104(a)(1)(B).

[33]*Boyle v. State*, 363 Ark. 356, 214 S.W.3d 250 (2005).

[34]Ark. Code Ann. § 5-10-104(a)(1)(A); *Furlow v. State*, 2023 Ark. App. 192, 664 S.W.3d 457.

before Ward's actions that resulted in Benson's death. The evidence was that Ward and Benson had an argument; Ward was intoxicated and angry that Benson did not want him to leave the house and go out drinking with his friends. There was no claim that Benson physically assaulted Ward, threatened him, or wielded a weapon of any kind before Ward grabbed her by her neck, repeatedly slammed her head into a door, and strangled her to death. Further, while Ward contends there was evidence he was emotionally disturbed in the moments *after* he committed the murder, he provided no argument that he was in an extreme emotional state before or during the murder. We affirm the circuit court's decision that there was no rational basis for giving a manslaughter instruction.

Affirmed.

KLAPPENBACH, C.J., and HARRISON, J., agree.

*Terry Goodwin Jones*, for appellant.

*Tim Griffin*, Att'y Gen., by: *James Hill*, Ass't Att'y Gen., for appellee.